2007-NMCA-082

161 P.3d 920

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Ricky W. EMMONS, Defendant–
Appellant.**

**No. 25,823.**

Court of Appeals of New Mexico.

May 11, 2007.

Certiorari Denied, No. 30,440,
June 25, 2007.

Gary K. King, Attorney General, Santa Fe, NM, Steven S. Suttle, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Karl Erich Martell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

KENNEDY, Judge.

{1} Defendant Ricky Emmons pleaded no contest to two counts of aggravated assault with a deadly weapon after the district court refused to issue Defendant's requested jury instructions, reserving his right to appeal the district court's decision.

{2} Defendant[1] chased down and confronted a pair of repo men at gunpoint who had repossessed his truck from his yard the night of October 2, 2003. During the confrontation, he fired a round into the air and pointed his weapon at the repo men. On appeal, Defendant maintains that the district court erred by refusing his tendered jury instructions on self-defense, defense of property, and citizen's arrest. We affirm.

## FACTS AND PROCEDURAL HISTORY

{3} About 9:30 on the night in question, Defendant was watching television with his family when he noticed headlights in his driveway. When he went out on his porch, he saw his truck backing down his driveway. Believing his truck was being stolen as had happened to him once before, he returned to the house, got a pistol, and drove off after his truck. At no time did Defendant or a member of his family call the police to report the theft of the truck.

{4} Down the road, he saw a red car he recognized as having been at his house minutes before. With his dome light on, he pulled the car aside. Defendant's version varies from the repo man's version here: Defendant contends that he pointed his finger at the driver, who then pulled over; and the repo man testified that Defendant ran him off the road. Defendant continued up the road, eventually overtaking the repossessed truck. He pulled alongside his truck,

---

1. Defendant is a former certified police officer.

forcing the driver to pull off the road at gunpoint. Defendant then blocked the truck with his vehicle, got out, and at gunpoint, ordered the driver of his truck out of the cab and to the roadside. At this time, the driver of the red car pulled up from where it had stopped earlier. The person occupying the red car testified that he heard Defendant identify himself as a police officer and repeatedly tell the driver of the truck "You're going to die." Defendant then pointed his gun at the person in the red car. When the driver of the truck did not leave from the truck as ordered, Defendant fired a shot, intending to show the driver he "was serious"; he testified he fired away from them, neither of the other men knew where the shot was directed.

{5} Both men told Defendant that they were repossessing the truck on a few occasions during the incident. Defendant told the driver of his truck that he would shoot him if he did not get out of the truck. The driver of the repossessed truck got out, and Defendant nudged him in the chest with the gun, continuing to threaten him. The repo men informed Defendant on several occasions that they were effecting a repossession, but Defendant ordered both repo men to leave, and they left the scene in the red car. There was no talk of arresting the men, and Defendant did not contact the police to report the incident. Defendant then drove the truck in question to his father-in-law's ranch, with his wife's assistance. The repo men contacted the police immediately, and the police were waiting for Defendant when he returned home. Defendant gave a statement that does not materially differ from the facts above, at the end of which he stated, "I have the right to protect my life, the life of my family, and my property." He was eventually charged as noted above and went to trial.

{6} At trial, Defendant offered jury instructions on self-defense, defense of property, and citizen's arrest. After argument before the court, the instructions were denied. Defendant conditionally pleaded no contest to the aggravated assault charges, reserving the jury instruction issue for this appeal.

## DISCUSSION

{7} We review the refusal of a jury instruction de novo, as a mixed question of law and fact. *State v. Ruiz,* 2007–NMCA–014, ¶ 56, 141 N.M. 53, 150 P.3d 1003. Defendant is entitled to a jury instruction that supports his theory of the case, *see State v. Romero,* 2006–NMCA–045, ¶ 44, 139 N.M. 386, 133 P.3d 842, *cert. granted,* 2006–NMCERT–004, 139 N.M. 429, 134 P.3d 120, but only when that theory is supported by the evidence presented at trial. *See Ruiz,* 2007–NMCA–014, ¶ 59, 141 N.M. 53, 150 P.3d 1003 (noting that jury instructions are intended to "describe principals of law, such as the elements of offenses, burdens of proof, and presumptions for the benefit of the jury"). For the jury instruction concerning the defense to be given, the evidence must support every element of that defense. *See Poore v. State,* 94 N.M. 172, 175, 608 P.2d 148, 151 (1980); *State v. Trammel,* 100 N.M. 479, 481, 672 P.2d 652, 654 (1983) ("[W]hen there is evidence to support a finding of every element of a defense, an instruction on that defense is required."). "Failure to instruct a jury on defendant's theory of the case is reversible error." *State v. Jernigan,* 2006–NMSC–003, ¶ 3, 139 N.M. 1, 127 P.3d 537.

{8} The State's brief begins by acknowledging that a citizen has the right to defend his life, his family, or his dwelling from attack, including the warranted use of deadly force. However, NMSA 1978, § 30–2–7 (1963), to which the State cites, says homicide is justified to protect those interests *plus a citizen's "property."* Section 30–2–7(A) (emphasis added). The statute, by ostensibly recognizing a right to use deadly force to defend property, is more expansive than the State acknowledges. Similarly, Subsection (C) of Section 30–2–7 allows the use of deadly force by a citizen to "apprehend any person for any felony committed in his presence." Section 30–2–7(C). It is these provisions with which we grapple here.

{9} Defendant chased the men who repossessed his car some minutes after they had left his property, and held them at gunpoint, firing a warning shot to prove that he was "serious" until such time as he told them to

leave. The trespass, if any, to Defendant's home and curtilage ceased before he sallied forth to apprehend the repo men. Indeed, Defendant lost sight of them for some time before spotting them.[2] It was he who sought them out by pursuing them from his house to the place of their roadside meeting. This case has nothing to do with self-defense. There is no dispute in this case that Defendant's pointing his handgun at the repo men and threatening to use it is the threat of deadly force. There is no dispute that Defendant told the men he would kill them, which is fairly and objectively taken to be a manifestation of intent to use deadly force. The use of deadly force in defending one's chattels against theft is the issue with which we are concerned here, as we are also concerned with the use of deadly force in the apprehension of an apparent felon who commits his crime in a person's presence.

{10} "Aggravated assault consists of . . . *unlawfully* assaulting . . . another with a deadly weapon[.]" NMSA 1978, § 30–3–2(A) (1963) (emphasis added); *see State v. Johnson*, 1996–NMSC–075, ¶ 19, 122 N.M. 696, 930 P.2d 1148 (hereinafter *Johnson I* ) (internal quotation marks and citation omitted). " 'Unlawful' means 'without lawful justification or excuse,' " *State v. Parish*, 118 N.M. 39, 42, 878 P.2d 988, 991 (1994) (citation omitted), and a defendant claiming that an assault was justified because of his right to defend his property or make a citizen's arrest is challenging this essential element of unlawfulness. *See id.* Defendant maintains that having presented evidence that his truck was taken, he had a legal right to act and to have the jury instructed on this theory.

## Self–Defense

{11} Defendant's claim for self-defense apparently stems from two related considerations, both of which are inadequate to establish a factual basis sufficient to justify giving the instruction. At trial, Defendant testified that he pointed his gun at the occupant of his truck because "I could not see where his hands were . . . [and] I didn't know

this person." Additionally, the arrival of the second man in the car further exacerbated Defendant's unease, as he states in his brief: "He produced a gun for his own protection-alone as he was on a dark highway in the country at night, outnumbered by men whom he believed had just committed a felony against him."

{12} Defendant correctly points out that the proper elements of self-defense are "(1) an appearance of immediate danger of death or great bodily harm to the defendant, (2) the defendant was in fact put in fear by the apparent danger, and (3) a reasonable person in the same circumstances would have reacted similarly." *State v. Abeyta*, 120 N.M. 233, 239, 901 P.2d 164, 170 (1995). Defendant was on a mission to retrieve property already gone from his house. He forced his apparently stolen truck off the road at gunpoint, and initiated contact with its driver by maintaining his threat of using deadly force. *Abeyta* looks with disdain on situations in which the Defendant was the aggressor or instigator. *Id.* ("[T]he claim of self-defense may fail if the defendant was the aggressor or the instigator of the conflict[.]"). There was no appearance of immediate danger or death before Defendant drew his gun on the repo men. *See State v. Lucero*, 1998–NMSC–044, ¶ 8, 126 N.M. 552, 972 P.2d 1143. Defendant's drawing of his pistol precludes him from receiving an instruction on self-defense. *Id.*

{13} Defendant's statement that he did not "instigate anything" when the repo men "came up the driveway to start the incident" is not credible. The repo men were there and gone with his truck before Defendant even went for his gun. It was Defendant who got a gun, got in a truck, drove off, and seeing no one on the road, paused on an overpass to determine which road was likely traveled by the repo men. Seeing no one on the road he was on, he took off chasing them down another. It was he who was seeking to retrieve property already gone. We note below that he had no intention of involving the police—he was going to take his property

---

**2.** Defendant's brief in chief indicates that Defendant knew only of three ways the repo men could have traveled. Defendant drove in that general

direction until he saw the red car that he recognized as being in his driveway.

back himself. This is not defensive, rather, an offensive use of deadly force which is not justified. The district court correctly denied the self-defense instruction.

**Defense of Property**

{14} We surmise from Defendant's brief in chief that he is also appealing the denial of the defense of property instruction. We need not delve into under what circumstances a person may employ the threat of deadly force in defense of property here. Defendant has not sufficiently articulated the facts upon which the instruction should be based, and mischaracterized his argument in his brief in chief as an argument for the self-defense instruction. UJI 14–5180 NMRA was the basis for the jury instruction defendant presented to the court. Defendant's requested jury instruction read: "It appeared to [Defendant] that Mr. Rodriguez and/or Mr. Lind [the repo men] was about to steal [Defendant's] vehicle and that it was necessary to forcibly stop and force Mr. Rodriguez out of such vehicle in order to stop Mr. Rodriguez and/or Mr. Lind[.]" The evidence clearly established that Defendant did not pursue the repo men until some minutes after he had watched them drive away. Instead, Defendant first went to his bedroom and grabbed his pistol. We hold that Defendant's actions defeat the second element of the jury instruction, since the action was not taken to prevent the theft, but rather to recover a truck already stolen. *See State v. Waggoner*, 49 N.M. 399, 404, 165 P.2d 122, 125 (1946) (noting that when "no trespass [was] being threatened as against [defendant's] habitation, an attempt to take the life of the trespasser merely to recover property would not have been justified"). We accordingly do not address the question of whether Defendant's use of force was reasonable for the defense of his property, but turn to reasonableness in the context of his attempting to interpose a defense of citizen's arrest.

**The Doctrine of Citizen's Arrest**

{15} Citizen's arrest is a power historically extended only to cases involving the commission of a felony, though later extended to citizens for a breach of the peace

occurring in their presence. *Inc. County of Los Alamos v. Johnson*, 108 N.M. 633, 638, 776 P.2d 1252, 1257 (1989). Noting the latter extension, however, the Supreme Court specifically declined to favor citizen's arrest for breaches of the peace, stemming from their concern that such an expansion of citizen power might likely lead to more breaches of the peace and encourage vigilantism. *Id.* "Vigilantism" is "unreasonable self-help action by citizens that tends to disrupt the administration of the criminal justice system." *State v. Johnson*, 1998–NMCA–019, ¶ 15, 124 N.M. 647, 954 P.2d 79 (hereinafter *Johnson II* ) (internal quotation marks and citation omitted). It is this case upon which Defendant based his jury instruction.

{16} Defendant points to *Johnson I*, for the proposition that a person who has an objectively defensible belief that a felony was or has been committed, who acts in good faith in accordance with that belief, and who "act[s] with reasonable force under the circumstances," would be entitled to a jury instruction on the defense of citizen's arrest to counter either the criminal intent or unlawfulness elements of the crime. *Johnson I*, 1996–NMSC–075, ¶ 18, 122 N.M. 696, 930 P.2d 1148. Defendant's view of *Johnson I's* language is incomplete. The Supreme Court uses these criteria to distinguish unreasonable self-help action from actions undertaken in a "good-faith, objectively-reasonable effort to assist in law enforcement." *Id.*

{17} In *Johnson I*, the Supreme Court held that the defendant was entitled to have the jury instructed on the defense of citizen's arrest and that it had to find beyond a reasonable doubt that the defendant was not reasonably attempting to make a citizen's arrest. *Id.* The Supreme Court adopted an "objective-person" standard in order to "ensure good-faith, objectively-reasonable behavior." *Id.* ¶ 18 n. 3. In *Johnson I*, the defendant presented evidence raising the issue of his reasonable belief that a felony occurred in his presence, like this case. *Id.* ¶ 19. Unlike this case, however, the defendant in *Johnson I* raised the issue of his "good-faith belief in his lawful right to hold the perpetrator until he could obtain police assistance." *Id.* Rather than requiring a fel-

ony to have been committed, the Supreme Court authorized a citizen's arrest based on probable cause alone because "if the citizen's assistance in apprehending criminals is considered important for the safety and order of society, it would seem that the standard for measuring probable cause should be defined so as to protect the citizen who, in making an arrest, acts like a reasonable man." *Id.* ¶ 17 (internal quotation marks and citation omitted).

{18} We hold as a matter of law that Defendant's actions were not reasonable. When Defendant had the repo men at gunpoint, he informed them that he at least had been a police officer (they believed he said he was one), but Defendant also admitted that the other abusive language he was using would not have been tolerated had he retained his badge. He fired a warning shot into the darkness to reinforce his position. Having reclaimed his truck, he told the repo men to leave the scene, which they did.

{19} Furthermore, Defendant never intended to call the police; he stated he was seeking the return of his truck when he armed himself and left his house. When Defendant asserts that he was not required to call the police because when he arrived home, the police were already there, he misses the mark. By that point the police were there to investigate him as a criminal not a victim. In fact, when he returned home to find the police there, he was hostile to them—not a hallmark of the person acting to bring persons to the police for further action. This smacks of the very essence of vigilantism, and precisely runs afoul of the stated purpose of a citizen's arrest—holding the offender for the authorities. It is this last element of reasonableness—using the power of citizen's arrest to facilitate lawful process as opposed to pure self-help that Defendant has ignored, and which now renders his defense incomplete. We hold that under these circumstances, Defendant was not entitled to an instruction on citizen's arrest as a defense.

## CONCLUSION

{20} With regard to the denial of the jury instructions on defense of property, self-defense and citizen's arrest, we affirm the district court.

{21} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and MICHAEL D. BUSTAMANTE, Judges.