**Certiorari Granted, No. 31,489, Granted February 3, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-012**

**Filing Date:    December 9, 2008**

**Docket No. 27,236**

**STATE OF NEW MEXICO,**

   **Plaintiff-Appellee,**

**v.**

**JENNIFER ANN ROMERO,**

   **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY**
**Frank K. Wilson, District Judge**

Gary K. King, Attorney General
Andrea Sassa, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Mary A. Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**WECHSLER, Judge.**

**{1}**      A jury found Defendant Jennifer Ann Romero guilty of the fourth-degree felony of custodial interference under NMSA 1978, Section 30-4-4(B) (1989).  On appeal, Defendant argues that (1) the State failed to introduce evidence at her trial that was sufficient to support

1

the jury's verdict, (2) the district court erred in refusing to give certain jury instructions that she requested, and (3) the district court erred in denying her motion for a new trial. Although we conclude that a minor correction in Defendant's judgment and sentence is necessary, we affirm Defendant's conviction.

**BACKGROUND**

**{2}**     Following an adjudicatory hearing in children's court in August 2004, legal custody of Defendant's children, including her son Joseph, was temporarily transferred to the Children, Youth and Families Department (CYFD). Pursuant to the order that resulted from that hearing, Defendant was still able to have visitation with Joseph, but any such visitation "remain[ed] in the discretion of CYFD." Joseph was subsequently placed in a foster home in Las Cruces. In April 2005, while still in the legal custody of CYFD, Joseph, then fifteen years old, ran away from his foster home. Initially, Joseph went to a friend's house in Las Cruces, where he stayed for six days. Joseph then took a bus to Ruidoso. Upon arriving in Ruidoso, Joseph went directly to the home in which his grandmother and Defendant lived.

**{3}**     The following day, Defendant and Joseph's grandmother attempted to return Joseph to his foster home in Las Cruces. However, according to Joseph's later testimony, they were unable to do so because Joseph refused to disclose the address of his foster home and also threatened that he would either run away again or do harm to himself if he were forced to return. As a result, Defendant and Joseph's grandmother permitted Joseph to stay with them at their home. A few days later, Defendant contacted the CYFD caseworker in charge of Joseph's case by telephone. Defendant relayed her frustration to the CYFD caseworker that she was not informed that Joseph had run away from his foster home and vehemently questioned the quality of Joseph's foster care. Apparently, Defendant did not tell the CYFD caseworker during that conversation that Joseph was then with her at her home in Ruidoso, and the telephone call ended when the CYFD caseworker abruptly hung up on Defendant in reaction to her aggressive tone. The next day, a police officer, at the insistence of the CYFD caseworker, went to the home of Defendant and Joseph's grandmother. The officer found Joseph at the home and took him into custody. Defendant and Joseph's grandmother were each subsequently charged with a violation of Section 30-4-4.

**{4}**     Defendant's jury trial commenced on November 21, 2005. At trial, the State offered the CYFD caseworker's testimony. The CYFD caseworker testified that she made no attempt to contact Defendant or Joseph's grandmother before Defendant contacted her by telephone. She also stated that in that telephone call, Defendant (1) expressed her resentment of the fact that CYFD took custody of Joseph, (2) relayed her concern that Joseph would run away again if he were forced to return to foster care, and (3) admitted that she had purchased the bus ticket for Joseph to return to Ruidoso. The CYFD caseworker later admitted on cross-examination that Defendant did not provide Joseph with any money to purchase the bus ticket from Las Cruces to Ruidoso.

**{5}**     After the State rested its case, Defendant's counsel expressed his intention of calling

2

Joseph's grandmother to testify. However, soon thereafter, it came to light that Joseph's grandmother had elected not to testify. Instead, Joseph was called as Defendant's first witness. Joseph testified that because he was unhappy at his foster home, he decided to run away and stay at a friend's house in Las Cruces. He further testified that after a few days at his friend's house, his friend's mother purchased a bus ticket for him to Ruidoso. He stated that neither Defendant nor his grandmother was aware that he was planning on returning to their home in Ruidoso. Finally, Joseph testified that (1) Defendant and his grandmother encouraged him to return to his foster home but that he was unwilling to do so, (2) neither Defendant nor his grandmother attempted to hide from the authorities the fact that he was living at their home, and (3) there was no plan for him to stay at their home for an extended period of time.

**{6}** After Defendant rested her case, the district court instructed the jury according to Section 30-4-4(C). Ultimately, the jury returned a verdict of guilty. About one month later, Defendant filed a motion for a new trial, arguing, among other things, that because Joseph's grandmother was then willing to testify, her testimony constituted "newly discovered evidence that was not available at trial due to her unavailability" and made a new trial necessary. The district court denied that motion. In November 2006, Defendant was sentenced to eighteen months of probation for her fourth-degree felony conviction of "Custodial Interference" under Section 30-4-4(B). This appeal followed.

**CUSTODIAL INTERFERENCE AND UNLAWFUL INTERFERENCE**

**{7}** We begin our analysis by noting that it appears as if the district court erroneously noted in Defendant's judgment and sentence that she had been convicted of custodial interference under Section 30-4-4(B). Our review of the instructions given to the jury indicates that Defendant was actually convicted of unlawful interference under Section 30-4-4(C). Although custodial interference under Section 30-4-4(B) and unlawful interference under Section 30-4-4(C) share several crucial elements and are both fourth-degree felonies, they differ in at least two material ways. Subsection B requires proof that the defendant actually had a right to custody of the child at issue, whereas Subsection C requires proof that the defendant did not have such a right. *Compare* § 30-4-4(B) (including "having a right to custody of a child" as an element of the crime of custodial interference), *with* § 30-4-4(C) (including "not having a right to custody" of a child as an element of the crime of unlawful interference). In Defendant's case, the jury was instructed that it was required to find that Defendant "did not have the right to custody of Joseph." Because the jury found Defendant guilty, it necessarily found beyond a reasonable doubt that Defendant did not have such a right. Additionally, custodial interference under Section 30-4-4(B) includes a "good cause" exception, but unlawful interference under Section 30-4-4(C) does not. *Compare* § 30-4-4(B) (requiring proof that the element of "maliciously taking, detaining, concealing or enticing away or failing to return" the child at issue was committed "without good cause"), *with* § 30-4-4(C) (failing to include a good cause exception to the element of "maliciously taking, detaining, concealing or enticing away or failing to return" the child at issue). The jury instructions in this case did not include reference to a good cause exception. Our review

3

of the jury instructions therefore leads us to the conclusion that (1) the jury was instructed on unlawful interference, not custodial interference and (2) Defendant was convicted of unlawful interference, not custodial interference.

**{8}** Despite the error included in Defendant's judgment and sentence, Defendant was initially charged with one count of unlawful interference under Section 30-4-4(C). However, as Defendant notes in her brief in chief, the record contains inconsistencies about whether she was being charged under Section 30-4-4(B) for custodial interference or Section 30-4-4(C) for unlawful interference. Defendant therefore argues that because she was under the erroneous impression that she was being charged for custodial interference under Section 30-4-4(B), she was effectively prevented from preparing a proper defense to the charge of unlawful interference under Section 30-4-4(C). According to Defendant, and without citation to any authority, such an error entitles her to a new trial.

**{9}** Although we agree that the record reveals a number of inconsistences as to which charge Defendant was facing before she was tried, we emphasize that (1) the jury was properly instructed pursuant to Section 30-4-4(C) and (2) the record and transcripts readily reveal that Defendant was well aware of the State's position that she did not have a right to custody of Joseph. Given the State's repeated assertion that Defendant did not have a right to custody of Joseph, a conviction under Section 30-4-4(B) would have been impossible. We therefore conclude that Defendant was convicted of unlawful interference under Section 30-4-4(C) and that any reference in the record to either custodial interference or Section 30-4-4(B) is erroneous. However, because any such error did not prejudice Defendant, a new trial is not necessary. *See State v. Bonham*, 1998-NMCA-178, ¶ 23, 126 N.M. 382, 970 P.2d 154 ("For error to be reversible, it must be prejudicial."), *abrogated on other grounds by State v. Traeger*, 2001-NMSC-022, ¶ 20, 130 N.M. 618, 29 P.3d 518. Accordingly, we analyze this case with the understanding that Defendant was convicted of unlawful interference under Section 30-4-4(C), not custodial interference under Section 30-4-4(B).

**SUFFICIENCY OF THE EVIDENCE**

**{10}** Defendant argues that the evidence presented at trial was insufficient to support the jury's guilty verdict. "In reviewing the sufficiency of evidence used to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Our task on appeal is to determine whether "a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Id.* (internal quotation marks and citation omitted). If so, we are required to affirm the conviction. *Id.*

**{11}** In order to convict Defendant of unlawful interference under Section 30-4-4(C), the jury was instructed that it was required to find beyond a reasonable doubt the following elements: (1) that Defendant "did not have the right to custody of Joseph"; (2) that Defendant "maliciously took, detained, concealed or enticed away Joseph"; (3) that

4

Defendant "intended to detain or conceal Joseph . . . permanently or for a protracted time from any person or agency having a right to custody of Joseph"; (4) that Joseph "was under the age of 18"; and (5) that the events in question happened in New Mexico in April 2005. Defendant asserts that several of those elements were not adequately supported by the evidence presented at trial, and we address each of her arguments in turn.

## A. Right to Custody

{12} Defendant first contends that the State failed to prove that she did not have a "right to custody" of Joseph. *See* § 30-4-4(C). A "right to custody" is defined as "the right to physical custody or visitation of a child arising from . . . a custody determination." Section 30-4-4(A)(5)(b). Defendant makes two arguments in support of her position that the State failed to prove this element of unlawful interference. First, Defendant relies on this Court's decision in *State v. Sanders*, 96 N.M. 138, 628 P.2d 1134 (Ct. App. 1981), for the proposition that because the State failed to show that the court orders awarding temporary legal custody to CYFD complied with Rule 10-350(A) NMRA, they "cannot be used to prove that [Defendant] had been deprived of her legal right to custody." Second, Defendant argues that even if those orders were valid, her retention of "parental rights" and limited visitation rights, which were expressly subject to CYFD's discretion, must lead to a result that she retained a right to custody under Section 30-4-4(A)(5)(b).

{13} In *Sanders*, the defendant was convicted of custodial interference, under a former version of the custodial interference statute, after he took his young child to Texas following a district court's oral ruling that temporarily awarded custody of the child to the Department of Human Services. *Sanders*, 96 N.M. at 139-40, 628 P.2d at 1135-36. On appeal, the defendant argued that because no written order awarding custody to the Department of Human Services was ever entered, he could not be punished for custodial interference. *Id.* at 141, 628 P.2d at 1137. We agreed, concluding that the "defendant's legal right to custody of the child did not end until entry of, and the giving of, notice of a judgment in compliance with Rule 62(a)," which is now codified as Rule 10-350(A) (requiring that a "judgment and disposition in abuse and neglect proceedings" be written and filed and that the clerk give notice of its entry and disposition to the interested parties). *Sanders*, 96 N.M. at 142, 628 P.2d at 1138. Unlike *Sanders*, in this case, written orders temporarily granting legal custody of Joseph to CYFD were entered and filed in the district court. Furthermore, given the telephonic approval of the orders by Defendant's attorney, there is no reason to assume that Defendant was not given adequate notice of the district court's judgments. We therefore find no merit in Defendant's argument that the orders temporarily granting legal custody of Joseph to CYFD—which were written, entered, and filed in the district court—did not comply with Rule 10-350(A), thereby requiring reversal under *Sanders*.

{14} With respect to Defendant's argument that she retained a right to custody as a result of her natural parental rights and the provisions in the court orders that allowed her visitation with Joseph subject to CYFD's discretion, we also disagree. The district court orders clearly state that CYFD was temporarily granted legal custody of Joseph and that visitation between

5

Defendant and Joseph was to "remain in the discretion of CYFD." Defendant argues that those provisions left her with a "limited" right to custody under Section 30-4-4(A)(5)(b). However, our reading of the order indicates that Defendant was denied any right to legal or physical custody of Joseph and that she was granted no absolute or enforceable right to visitation. CYFD retained complete discretion regarding any visitation that Defendant would be permitted to have with Joseph. As a result, Defendant did not have any "right to custody" under Section 30-4-4(A)(5)(b). We therefore conclude that the evidence presented to the jury was sufficient to support its conclusion that Defendant "did not have the right to custody of Joseph."

## B. Maliciously Took, Detained, Concealed, or Enticed Away

{15} Next, Defendant contends that she did not maliciously take, detain, conceal, or entice away Joseph. In addressing Defendant's argument, we first consider whether sufficient evidence was presented at trial to support the jury's conclusion that Defendant took, detained, concealed, or enticed away Joseph.

{16} We initially note that we agree with Defendant that the evidence presented at trial tends to prove that Joseph left his foster home and made his way to Defendant's home in Ruidoso on his own volition. The crux of the first question before us therefore becomes whether Defendant violated Section 30-4-4(C) by allowing Joseph to stay with her at her home after he arrived. The State argues that a rational jury could have found beyond a reasonable doubt that Defendant detained or concealed Joseph before the police took him into custody, and we agree. This Court has previously stated that the word "detaining," as used in Section 30-4-4, may be defined as "keeping in custody," *State v. Luckie*, 120 N.M. 274, 279, 901 P.2d 205, 210 (Ct. App. 1995), and the jury in this case was so specifically instructed. The jury was also instructed, without objection from Defendant's counsel, that the word "conceal" may be defined as "to hide or to keep secret." The evidence presented at trial showed that Defendant allowed Joseph to stay with her in her home and that she never informed either the police or CYFD that he was doing so. As such, and in light of the definitions that were given, a rational jury could have concluded that Defendant either detained or concealed Joseph. Defendant argues that it could not have been determined that she detained Joseph simply because she "did not throw her son out of her house upon his arrival there." However, we agree with the State that a jury could reasonably have concluded that Defendant kept Joseph in her custody without informing the authorities until the police arrived to return him to CYFD, thus detaining him. Defendant additionally argues that because (1) she allowed Joseph to go to public places and (2) she placed the telephone call to the CYFD caseworker, a rational jury could not have concluded that she concealed Joseph.

{17} With respect to the first argument, the fact that Joseph was not physically hidden in Defendant's house does not necessarily lead to the conclusion that he was not hidden from CYFD or that his location was not kept secret from CYFD. With respect to the second argument, Defendant admits that although she placed a telephone call to the CYFD

6

caseworker a few days after Joseph arrived at her home, she never informed anyone at CYFD or any other authority figure that Joseph was living with her. Therefore, based on the evidence presented at trial, we cannot say that a rational jury could not have concluded that Defendant concealed or detained Joseph under Section 30-4-4(C).

{18}    Having so concluded, we must next determine if a rational jury could have concluded that Defendant acted maliciously in detaining or concealing Joseph. In *Luckie*, we stated that the term "maliciously," as used in Section 30-4-4, may be defined as "intending to do a wrongful act." *Luckie*, 120 N.M. at 279, 901 P.2d at 210. As we discussed above, the evidence presented at trial indicates that Defendant was aware of the fact that CYFD had legal custody of Joseph. Therefore, by making the decision not to inform the authorities that Joseph had run away from his foster home and was staying with her, a rational jury could have concluded that Defendant acted maliciously by intending to do the wrongful act of detaining or concealing Joseph, thereby depriving CYFD of its court-ordered legal custody of Joseph. To the extent that Defendant argues that there were factors that tend to mitigate the wrongfulness of her actions, that question was for the jury to decide, and apparently it rejected Defendant's arguments.

## C.    Intent to Detain or Conceal Permanently or for a Protracted Period of Time

{19}    Finally, Defendant contends that insufficient evidence was presented at her trial to support the jury's conclusion that she intended to detain or conceal Joseph permanently or for a protracted period of time. The jury was instructed that the term "protracted" may be defined as "draw[n] out in time, prolong[ed]," and Defendant did not object to that definition. Although Defendant emphasizes that she "did not surrender her son voluntarily insofar as she did not drive him to CYFD or the police station and turn him over to the authorities," she maintains that the four days that Joseph stayed with her at her home "cannot be characterized as 'protracted' under New Mexico law."

{20}    Specifically, Defendant relies on Section 30-4-4(G), which states that a charge of unlawful interference "may be dismissed if the person voluntarily returns the child within fourteen days after taking, detaining or failing to return the child in violation of this section." Defendant argues that Section 30-4-4(G) "raise[s] a strong possibility that the legislature did not intend for any violation lasting less than the fourteen day amnesty window to be regarded as taking place over a protracted period of time." We disagree with Defendant's reading of Section 30-4-4(G), which requires the voluntary return of the child within fourteen days of the offender's failure to return the child. As Defendant concedes that she "did not surrender her son voluntarily" or "turn him over to the authorities," her argument fails. We also note that Section 30-4-4(G) permits but does not require a dismissal of a felony charge if the person possessing the child returns the child within the period. Even had Defendant complied with the statute, any decision to dismiss would still be squarely within a prosecutor's discretion.

{21}    The question of how long Defendant planned to allow Joseph to live with her at her

7

home was therefore one for the jury to decide. Apparently the jury came to the conclusion that Defendant, despite the evidence presented that she initially attempted to return Joseph to his foster home and later contacted the CYFD caseworker by telephone, intended to allow Joseph to live with her for a drawn out or prolonged period of time. As the State argues, evidence was presented at trial that Defendant strongly believed that Joseph did not belong in foster care and that she never actually informed any authority figure that Joseph was living with her. Taking that evidence into account, we conclude that a rational jury could have determined that Defendant intended to detain Joseph or conceal his location from CYFD permanently or for a prolonged period of time. *See Rojo*, 1999-NMSC-001, ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts.").

## JURY INSTRUCTIONS

**{22}** Having concluded that sufficient evidence was presented at trial to support the jury's verdict, we next address Defendant's argument that the district court erred in failing to instruct the jury in several distinct ways. "We review the refusal of a jury instruction de novo, as a mixed question of law and fact." *State v. Emmons*, 2007-NMCA-082, ¶ 7, 141 N.M. 875, 161 P.3d 920. A "[d]efendant is entitled to a jury instruction that supports his theory of the case, but only when that theory is supported by the evidence presented at trial." *Id.* (citation omitted). A defendant's showing on appeal that he or she was entitled to a jury instruction that was not given at trial constitutes reversible error. *Id.*

### A.    Section 30-4-4(B) and Good Cause

**{23}** Defendant first contends that the district court erred in failing to instruct the jury "in accordance with Section 30-4-4(B)," including an instruction explaining its "good cause" exception. *See* § 30-4-4(B) (requiring a showing that a defendant who is charged with custodial interference had custody of a child and maliciously took, detained, concealed, enticed away, or failed to return the child "without good cause and with the intent to deprive permanently or for a protracted time another person also having a right to custody of that child"); *see also State v. Munoz*, 2006-NMSC-005, ¶ 22, 139 N.M. 106, 129 P.3d 142 (considering the propriety of a "good cause" instruction given in a case in which the defendant faced a charge of custodial interference under Section 30-4-4(B)). In addressing this argument, we reiterate our conclusion that Defendant was charged with and tried for unlawful interference under Section 30-4-4(C), not custodial interference under Section 30-4-4(B), and note that our legislature chose not to include a good cause exception in Section 30-4-4(C). As such, we fail to see the merit in Defendant's argument that the jury should have been instructed according to Section 30-4-4(B) or the good cause element included therein. *See* § 30-4-4(C) (failing to include the good cause element that is included in Section 30-4-4(B)). Even if we concluded that Defendant was, as she argues, charged with violations of both Section 30-4-4(B) and Section 30-4-4(C), our result would be the same. As we explain above, the children's court orders introduced into evidence at trial established that Defendant did not have a right to custody of Joseph under Section 30-4-4(A)(5)(b). As

8

such, any theory concerning Section 30-4-4(B), which requires as one of its elements proof beyond a reasonable doubt that the defendant actually had a right to custody of the child in question, was not supported by the evidence presented at trial and did not warrant a jury instruction. *See Emmons*, 2007-NMCA-082, ¶ 7.

### B.    Provision of Definitions

**{24}**    Defendant also argues that the district court erred in failing to provide the jury with definitions of several terms bearing upon the jury instruction pertaining to Section 30-4-4(C).  Specifically, Defendant contends that the district court should have granted her requests to include an instruction specifically defining the terms "physical custody," "right to custody," and "custody determination."

**{25}**    In *Munoz*, our Supreme Court stated, in considering the propriety of a defendant's conviction for custodial interference under Section 30-4-4(B), that "[w]here the issue is the failure to instruct on a term or word having a common meaning, there is no error in refusing an instruction defining the word or term." *Munoz*, 2006-NMSC-005, ¶ 24 (internal quotation marks and citation omitted).  With respect to the term "right to custody," Defendant argues that "its meaning within the statute differed from its potential use elsewhere" and that the district court therefore "should have provided a definition for the term."  However, Defendant offers no explanation regarding how the term did not have a common meaning and therefore required the district court to provide a definition in the jury instructions.  In any event, the district court explicitly permitted the jury to request definitions of confusing words or terms included in the instructions during its deliberations, and the jury specifically requested definitions for the words "concealed," "protracted," and "detained."  The jury did not, however, request a definition for the term "right to custody."  We therefore infer from the jury's failure to request a definition that the term was adequately explained in closing arguments and that the jury was not confused as to its meaning.

**{26}**    Moreover, with respect to the terms "physical custody" and "custody determination," the instruction actually given to the jury did not include either of those terms.  Accordingly, and in light of the fact that the jury instruction given accurately reflected the language included in Section 30-4-4(C), we fail to see the relevance of providing the jury with definitions of those terms.

### C.    Duress

**{27}**    Defendant also argues that the district court erred in refusing to provide the jury with an instruction on the defense of duress.  As Defendant explains in her brief in chief, a successful duress defense requires a showing "(1) that the defendant committed the crime under threats; (2) that the defendant feared immediate great bodily harm to himself or another person if he did not commit the crime; and (3) that a reasonable person would have acted in the same way under the circumstances." *State v. Duncan*, 111 N.M. 354, 355, 805 P.2d 621, 622 (1991).

9

**{28}** Defendant's argument is premised on the contention that because Joseph mentioned the possibility that he would do harm to himself if he were forced to return to foster care, Defendant acted reasonably in committing the crime of unlawful interference. However, although evidence was presented at trial that Joseph gave Defendant and his grandmother "the impression" that he might do harm to himself if forced to return to foster care, none was presented that Defendant reasonably feared that Joseph was in immediate danger of great bodily harm and that Defendant therefore felt forced to commit the crime of unlawful interference. Therefore, we cannot say that the district court erred in refusing to instruct the jury on Defendant's duress defense. *See Emmons*, 2007-NMCA-082, ¶ 7.

## MOTION FOR A NEW TRIAL

**{29}** Finally, Defendant argues that the district court erred in denying her motion for a new trial based on the "newly discovered evidence" of the testimony of Joseph's grandmother.

> A motion for a new trial on grounds of newly-discovered evidence will not be granted unless the newly-discovered evidence fulfills all of the following requirements:
>
> 1) it will probably change the result if a new trial is granted; 2) it must have been discovered since the trial; 3) it could not have been discovered before the trial by the exercise of due diligence; 4) it must be material; 5) it must not be merely cumulative; and 6) it must not be merely impeaching or contradictory.

*State v. Garcia*, 2005-NMSC-038, ¶ 8, 138 N.M. 659, 125 P.3d 638 (internal quotation marks and citation omitted).

**{30}** In support of her argument, Defendant states that Joseph's grandmother, who elected not to testify at Defendant's trial, would have testified at a second trial that (1) she gave Joseph permission to stay at her home, (2) Defendant unsuccessfully attempted to return Joseph to his foster home, (3) Joseph threatened to run away again or do harm to himself if forced to return to his foster home, (4) Defendant encouraged Joseph to return to his foster home and "committed no overt act to get him to remain with her at the expense of CYFD," and (5) Defendant did not know that Joseph was planning to run away from his foster home to be with her. In response, the State contends that because the new evidence upon which Defendant relies "simply duplicates trial evidence already offered," it must be deemed "cumulative, immaterial, and unlikely to change the result of the trial." We agree with the State. We fail to see how any of the testimony that would be offered by Joseph's grandmother at a second trial would provide anything but cumulative evidence to reinforce the evidence that was offered at Defendant's first trial. Indeed, Defendant argues in her brief in chief that the anticipated testimony of Joseph's grandmother would simply serve to "bolster the arguments of the defense in every respect." We therefore conclude that the district court did not err in denying Defendant's motion for a new trial.

**CONCLUSION**

**{31}** We conclude that (1) sufficient evidence was presented at trial to support the jury's verdict, (2) the district court did not err in refusing to give some of the jury instructions that Defendant requested, and (3) the district court did not err in denying Defendant's motion for a new trial. We therefore affirm. In doing so, we also remand to the district court to correct Defendant's judgment and sentence to reflect the fact that she was convicted of unlawful interference under Section 30-4-4(C), as opposed to custodial interference under Section 30-4-4(B).

**{32}    IT IS SO ORDERED.**

 

**JAMES J. WECHSLER, Judge**

**I CONCUR:**

**MICHAEL D. BUSTAMANTE, Judge**

**RODERICK T. KENNEDY, Judge (specially concurring)**

**KENNEDY, Judge (specially concurring).**

**{33}** I concur in this case; the law is clear, and Defendant participated in the circumstances just perfectly to justify her conviction. It is the role of the caseworker's antipathy toward working with Defendant, apparently mutual, and its effect on the development of the facts in this case that creates a subplot worthy of note.

**{34}** Joseph had been gone from CYFD custody for about ten days. The CYFD caseworker was informed by Joseph's foster mother of his running away on the day it happened. Though she expected Joseph to come back to Defendant's home, the caseworker never tried to contact Defendant to inform her of his disappearance or inquire whether Defendant had seen him, preferring to wait to see if he showed up in Lincoln County. The caseworker never sent the police to Defendant's house until after Defendant called her.

**{35}** Some three or four days after Joseph got to Defendant's home, she called the CYFD caseworker. Rather than use the chance to ascertain whether Joseph had acted per her expectation, the caseworker's testimony about the conversation was that Defendant was blaming her and CYFD for Joseph running away but "was not taking responsibility for why

11

her children came into custody." Since Defendant was also being abusive, the caseworker told her to come for a meeting to discuss the matter and "politely hanged up" on Defendant. The caseworker stated that she had not called Defendant because she had a hard time locating Defendant in the past; yet both Defendant and Joseph were at the address to which the caseworker unhesitatingly sent the police that evening.

{36}    Three things happened as a result of Defendant's contacting the caseworker. The caseworker terminated the conversation when she tired of Defendant's complaining about both the fact and quality of CYFD's custody of Joseph without Defendant's ever stating that Joseph was with her; the caseworker sent the police over to Defendant's house; and the caseworker lied in court about Defendant admitting in the conversation that she had supplied the money for Joseph's bus ticket from Las Cruces to Ruidoso when she knew the funds came from other sources.

{37}    Defendant's telephone call to the caseworker was no occasion for the caseworker to worry about Defendant's taking responsibility for the causes of her children being in CYFD custody. To pick that issue as a first recollection is tellingly a bureaucrat's reaction. A mother taking responsibility for bad parenting is of secondary concern to the acute situation of a child missing from State custody. A child has been missing for ten days, his mother knows about it, and the caseworker can interject sufficiently to tell the mother to come down to the office. The caseworker has no concern to force the question of whether the mother knows of her child's whereabouts and just remembers that mom doesn't understand that she's not a good mother overall.

{38}    Defendant had Joseph at her house for four days and violated the law in doing so. She has a history with CYFD's removal of Joseph and is likely a very unresponsive and hard person to work with when it comes to her parenting skills. That is no excuse for an agent of the State not to work pre-emptively with the mother in a situation like this. Here, despite the caseworker assuming that Joseph would come back to his mother, the person administering the terms of Joseph's State custody did nothing for a week to ascertain Joseph's whereabouts or try to notify his mother of her son's absence.

_____

**RODERICK T. KENNEDY, Judge**

Topic Index for *State v. Romero*, No. 27,236

AE          **Appeal and Error**
AE-HE       Harmless Error
AE-SB       Substantial or Sufficient Evidence
AE-SA       Standard of Review

CD          **Children**

CD-CN      Child Abuse and Neglect
CD-CS      Custody
CD-MC     Missing Child

**CL**         **Criminal Law**
CL-CI       Custodial Interference
CL-DS      Duress

**CA**         **Criminal Procedure**
CA-JI       Jury Instructions
CA-NT     New Trial

**EV**         **Evidence**
EV-NE     Newly Discovered Evidence