This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.                      **No. A-1-CA-35349**

**STEPHEN CASAUS a.k.a.,**
**STEVE CASAUS,**

     Defendant-Appellant.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.                      **No. A-1-CA-35349**

**STEPHEN CASAUS a.k.a.,**
**STEVE CASAUS,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Stanley Whitaker, District Judge**

Hector H. Balderas, Attorney General
Marko David Hananel, Assistant Attorney General

Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
C. David Henderson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**VARGAS, Judge.**

{1}     Defendant, Stephen Casaus, appeals his convictions for child abuse, tampering with evidence, and witness intimidation. He contends the district court erred when it denied his motion to continue the trial, excluded evidence, and refused his requested jury instruction. He also challenges the sufficiency of the evidence supporting each of his convictions and asserts that these errors combined to deprive him of a fair trial. We conclude that the district court did not abuse its discretion before or during Defendant's trial. Further, substantial evidence supports his child abuse not resulting in death, tampering with evidence, and intimidation of a witness convictions. However, the State failed to introduce sufficient evidence of causation to support Defendant's conviction for child abuse resulting in death. We therefore remand for the district court to vacate Defendant's conviction for child abuse resulting in death, and we affirm Defendant's other convictions. As this is a memorandum opinion and the parties are aware of the facts and procedural posture

2

of the case, we set forth only the facts and law necessary to our analysis of the issues that Defendant raises.

**BACKGROUND**

{2}      At approximately 4:30 p.m. on December 27, 2013, police responded to a report of an unresponsive child (Child) in Defendant's home. Upon arrival, officers discovered Child lying unresponsive; they were unable to detect breathing or locate a pulse, and Child's skin was cold to the touch. When the paramedics arrived a few minutes later at 4:36 p.m., they initiated CPR, began administering drugs, and transported Child to the hospital, but when he arrived at the hospital at approximately 5:20 p.m., he still had no pulse and was not breathing. Child was pronounced dead at 5:32 pm.

{3}      Following Child's death, law enforcement spoke with Defendant regarding the events of December 27, 2013, and what had happened to Child. Defendant made several voluntary statements, including a description of his actions that day that changed throughout the course of the investigation. First he told police that on the day of the incident, he awoke around noon and after about an hour, went to his friend's house to work on his friend's Cadillac. He stated that he was at his friend's house for approximately twenty minutes until around 2:00 p.m., when his wife, Child's mother, called and asked him to come home because Child had fallen off a bouncy horse that was in the house and was unresponsive.

3

**{4}** Defendant then changed his story by admitting that he had not left the residence at all that day, but instead woke up around two o'clock in the afternoon and went to the restroom. While in the restroom he heard Child's mother and Child yelling, and by the time he came out of the restroom, Child was lying on the floor, unconscious. Defendant claimed that he instructed Child's mother to call 911, but that she did not do so right away. When asked why he did not call 911 himself, Defendant explained that he thought Child was "faking it," and because he didn't know where any of the phones in the house were.

**{5}** In a third iteration of the day's events, Defendant claimed that after waking up around noon, he went to the restroom to ingest heroin, and while there, he heard yelling between Child's mother and Child and what he described as "tumbles and stumbles." He came out of the restroom, saw Child's mother yelling at Child, and admonished Child's mother before again returning to the restroom. When he came out of the restroom the second time, he found Child lying on the floor, alternating between being responsive and unresponsive. At that point Defendant panicked, and as a result failed to call 911 himself.

**{6}** In all three explanations, Defendant consistently maintained that he tried to revive Child by giving him CPR, putting him in a cold shower, and administering oxygen to him. In addition, though he initially denied having coached Child's

4

siblings on what to say about the incident, Defendant later admitted that he told them, "[d]on't say nothing. Everything's going to be okay. Don't say nothing."

{7} Defendant was indicted in April 2014 with six counts of child abuse, one count of tampering with evidence, and two counts of bribery of a witness.

{8} The State subsequently charged Defendant with another count of child abuse by filing an indictment in May 2015, and the district court joined the two cases in July 2015. Shortly after the cases were joined and approximately a month before the trial was scheduled to start, Defendant filed a motion to continue the trial, which the district court denied. A jury convicted Defendant of child abuse resulting in death, child abuse without death or great bodily harm, tampering with evidence, and two counts of bribery of a witness. Defendant was sentenced to eighteen years for the child abuse resulting in death conviction, and three years each for the remaining four convictions of child abuse without death or great bodily harm, tampering with evidence and two counts of bribery. Each conviction was enhanced by one year under the Habitual Offender Act, with the district court suspending five years of Defendant's total sentence for an actual sentence of thirty years. Defendant appeals.

**DISCUSSION**

{9} On appeal, Defendant makes numerous assertions of error, challenging the denial of a motion to continue the trial, the admission of evidence, the denial of a

5

requested jury instruction, and the sufficiency of evidence supporting each of his convictions. Defendant also argues that cumulative error deprived him of a fair trial. We address each argument in turn.

**A.      Denial of Motion to Continue**

**{10}**      In May 2015, Defendant filed a motion to compel the State to release materials containing information that Defendant claimed was exculpatory, and a motion seeking an independent psychological evaluation of Child's younger sister. The district court ordered in camera review of the materials in early July. Defense counsel filed an objection to the district court's ruling and simultaneously filed a motion to extend the trial date to allow her sufficient time to review the requested materials and consult with her expert witness. At a hearing in early August, the district court acknowledged Defendant's motion for continuance, but denied the motion, reasoning that because the records in question were "not terribly voluminous" the parties could still be ready for trial within "a few weeks."

**{11}**      We review a district court's denial of a motion for a continuance under an abuse of discretion standard. *See State v. Salazar*, 2007-NMSC-004, ¶ 10, 141 N.M. 148, 152 P.3d 135. Courts evaluate several factors when considering a motion for continuance, "including "the length of the requested delay, the likelihood that a delay would accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the

6

parties and the court, the legitimacy of the motives in requesting the delay, [and] the fault of the movant in causing a need for the delay[.]" *State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20. "In addition to meeting the *Torres* factors, [a d]efendant must show that the denial of the continuance prejudiced him[,]" by rendering "a potential avenue of defense unavailable[.]" *Salazar*, 2007-NMSC-004, ¶ 16 (internal quotation marks and citation omitted). When the district court's denial of the motion does not follow a logical application of these factors to the facts of the case, the district court has committed an abuse of discretion. *See State v. Gonzales*, 2017-NMCA-080, ¶ 32, 406 P.3d 534. "The defendant carries the burden of establishing an abuse of discretion, and that the abuse was to the injury of the defendant." *Id.*

{12} Defendant did not specify in his motion or at the hearing the length of the requested delay. The likelihood that a delay would have accomplished Defendant's objectives of consulting an expert seems minimal in light of the court's observations that the records themselves were not extensive and could be reviewed in the remaining weeks before trial. There were no other appreciable continuances in the case prior to Defendant's request, and there is nothing to suggest defense counsel's motives in requesting the delay were anything other than legitimate. It does not appear that Defendant created the need for the delay, as it centered on the State's delay in disclosing evidence. Finally, Defendant's prejudice argument

7

stemmed from his assertion that defense counsel would be ineffective if forced to continue without an extension because defense counsel did not have enough time to consult with an expert witness. Defendant's prejudice argument, however, is unpersuasive in light of the fact that Defendant was able to consult with an expert on the matter in question and presented that expert's testimony at trial. Given the deferential nature of our review, Defendant's failure to demonstrate prejudice, and the relatively equal division of factors weighing for and against the continuance, we conclude the district court did not abuse its discretion in denying Defendant's motion.

**B.      Redacted Evidence and the Rule of Completeness**

{13}      The State presented several of Defendant's voluntary statements using a short audiovisual presentation containing excerpts of Defendant telling law enforcement officers where he had been the day of Child's death and what he had done to revive Child. Prior to playing the recording for the jury, the State redacted statements regarding Defendant's affection for the children in the home, his characterization of his general interactions with Child, his denial that domestic violence occurred between himself and Child's mother, and his admission to having been a "junkie" in the past. The district court allowed the State to redact those portions of the video in an effort to remain consistent with a prior ruling excluding negative character evidence, reasoning that allowing evidence of

8

Defendant's good character, albeit through the State, would "open the door" to the negative character evidence already excluded through pretrial motions.

{14} "[W]e review a district court's ruling excluding evidence for an abuse of discretion." *State v. Garcia*, 2013-NMCA-064, ¶ 11, 302 P.3d 111. Defendant cites to Rule 11-106 NMRA to support his argument that the district court abused its discretion by allowing the State to admit portions of his statements to police without also including portions of those statements that he claims were exculpatory. Defendant does not specify how these statements amount to exculpatory rather than character evidence. *See Black's Law Dictionary* 675 (10th ed. 2014) (defining "exculpatory evidence" as "[e]vidence tending to establish a criminal defendant's innocence"); *see also id.* at 674 (defining "character evidence" as "[e]vidence regarding someone's general personality traits or propensities, of a praiseworthy or blameworthy nature").

{15} Rule 11-106, sometimes referred to as the "rule of completeness," provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." *Id.* The Rule is aimed at eliminating misleading or deceptive impressions created by "creative excerpting." *State v. Guerra*, 2012-NMSC-014, ¶ 41, 278 P.3d 1031 (internal quotation marks and citation omitted). "[T]he party

9

invoking the rule must show that the evidence is relevant to the issue in dispute and qualifies or explains the subject matter of the portion of the writing already admitted." *State v. Barr*, 2009-NMSC-024, ¶ 36, 146 N.M. 301, 210 P.3d 198, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37, 275 P.3d 110.

{16}    The admitted statements pertain to Defendant's actions the day Child died. The redacted portions of the video do not rebut or explain those statements. Rather, they contain generalizations about Defendant's relationship with household members and his drug use. Rule 11-106 does not exist to allow for the introduction of complete statements or documents in all instances, but rather in instances where doing so is necessary to shield a party from adverse inferences arising from "creative excerpting" or to allow explanation or rebuttal of the evidence already received. *See Guerra*, 2012-NMSC-014, ¶ 41. Defendant is not entitled to offer additional segments of the video simply because they exist and the State did not offer them. *See Barr*, 2009-NMSC-024, ¶ 36 ("Rule 11-106 does not mandate that a whole document automatically becomes competent upon introduction of a portion thereof."). Defendant's argument that allowing the State to "pick the good" and "leave out the bad" is contrary to the Rule 11-106's requirement that fairness requires introduction of the entire statement, absent a showing or assertion that the

10

admitted statements are misleading or deceptive, is therefore unpersuasive. The district court therefore did not abuse its discretion.

**C.      Denial of Defendant's Requested Causation Instruction**

{17}      Defendant also argues that the district court erred in denying his request that the jury be instructed on causation pursuant to UJI 14-251 NMRA to aid in its determination of the child abuse resulting in death count. Because Defendant preserved this issue below, "we review the instructions for reversible error." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (noting that when evaluating jury instructions, "we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction" and confusion or misdirection may stem from omission, misstatement, or failure to provide an accurate rendition of the relevant law (internal quotation marks and citation omitted)).

{18}      "[D]efinitional instructions are not required when the terms are used in their ordinary sense and no error is committed in refusing to instruct on a term or word with a common meaning." *State v. Gonzales*, 1991-NMSC-075, ¶ 30, 112 N.M. 544, 817 P.2d 1186; *see State v. Carnes*, 1981-NMCA-126, ¶ 17, 97 N.M. 76, 636 P.2d 895 (finding no error in refusing an instruction defining a word where the word was not a technical term and jurors could properly apply the common meaning). In other words, where a term is not a technical term carrying a legal

11

meaning separate from common usage, and application of the common meaning does not prejudice the defendant, jurors can properly apply its common meaning. *See Carnes*, 1981-NMCA-126, ¶ 17. Failure to provide a definitional instruction will not require reversal. *See id.* (approving of plain meaning interpretation of "hostage"); *see also State v. Munoz*, 2006-NMSC-005, ¶ 24, 139 N.M. 106, 129 P.3d 142 (same as to "protracted period of time" (emphasis omitted)); *Gonzales*, 1991-NMSC-075, ¶ 30 (same as to "help," "cause," and "encourage"); *State v. Aguirre*, 1972-NMSC-081, ¶ 36, 84 N.M. 376, 503 P.2d 1154 (same as to "held to service"); *State v. Romero*, 2009-NMCA-012, ¶ 25, 145 N.M. 594, 203 P.3d 125 (same as to "right to custody"); *State v. Lucero*, 1994-NMCA-129, ¶ 16, 118 N.M. 696, 884 P.2d 1175 (same as to "sexual actions"); *State v. Mankiller*, 1986-NMCA-053, ¶ 27, 104 N.M. 461, 722 P.2d 1183 (same as to "on or about"); *State v. Moss*, 1971-NMCA-117, ¶ 6, 83 N.M. 42, 487 P.2d 1347 (same as to "entrusted").

**{19}** The jury instruction for child abuse resulting in death directed the jury to determine whether, "[b]y engaging in [medical neglect, Defendant] caused or permitted [Child] . . . to be placed in a situation that endangered the life or health of [Child]" and whether Defendant's "conduct resulted in the death of Child[.]" This instruction tracked the language of the statute verbatim. *See* NMSA 1978, § 30-6-1(D)-(F) (2009); *State v. Doe*, 1983-NMSC-096, ¶ 8, 100 N.M. 481, 672 P.2d

654 (noting that "if the jury instructions substantially follow the language of the statute or use equivalent language, then they are sufficient"). We must therefore determine whether the phrase "resulted in" is a technical term that requires definition or whether its common meaning adequately informed the jury of all essential elements.

{20} The phrase "resulted in" carries a commonly understood meaning that undoubtedly required proof that Defendant's actions, or failure to act, led to Child's death; clearly the State was required to prove Defendant's medical neglect caused Child's death. Thus, this is not an issue of omission or failure to provide an accurate rendition of the relevant law, *see Benally*, 2001-NMSC-033, ¶ 12, and Defendant's proffered causation instruction, which served only to amplify an element that was already clear from the language of the child abuse instruction, was not akin to a missing elements instruction. *See State v. Barber*, 2004-NMSC-019, ¶ 26, 135 N.M. 621, 92 P.3d 633 (reaching same conclusion, reasoning "no distinct possibility exists from the evidence that the jury convicted [the d]efendant without finding all the elements beyond a reasonable doubt"). We conclude that the district court's denial of Defendant's requested instruction on proximate cause was not error.

**D.    Sufficiency of the Evidence**

**1.    Standard of Review**

13

{21} When a defendant asserts that the state has failed to prove all the elements of a charged crime, "the question on appeal is whether the jury's verdict is supported by sufficient evidence." *State v. Burke*, 2008-NMSC-052, ¶ 12, 144 N.M. 772, 192 P.3d 767. "In reviewing for sufficiency of the evidence, we must determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Torres*, 2018-NMSC-013, ¶ 42, 413 P.3d 467 (internal quotation marks and citation omitted) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (internal quotation marks and citation omitted)). "We must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Id.* (internal quotation marks and citation omitted). "[C]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [a d]efendant's version of the facts." *Burke*, 2008-NMSC-052, ¶ 12 (internal quotation marks and citation omitted); *see also State v. Montoya*, 2005-NMCA-078, ¶ 3, 137 N.M. 713, 114 P.3d 393 ("This Court does not consider the merit of evidence that may have supported a verdict to the contrary." (internal quotation marks and citation omitted)). "The reviewing court does not weigh the evidence or substitute its judgment for that of the fact[-]finder as long as there is sufficient

14

evidence to support the verdict." *State v. Mora*, 1997-NMSC-060, ¶ 27, 124 N.M. 346, 950 P.2d 789, *abrogated on other grounds as recognized by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683. "We measure the sufficiency of the evidence against the instructions given to the jury." *State v. Vargas*, 2016-NMCA-038, ¶ 27, 368 P.3d 1232.

## 2.    Child Abuse Resulting in Death

{22}    Defendant challenges his conviction for child abuse resulting in death by arguing that the State presented insufficient evidence that medical neglect was a significant cause of Child's death. The jury was instructed on this charge as follows:

> [T]he state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>     1. [Defendant] medically neglected [Child];
>     2. By engaging in the conduct described in Paragraph 1, [Defendant] caused or permitted [Child] to be placed in a situation that endangered the life or health of [Child];
>     3. [Defendant] showed a reckless disregard for the safety or health of [Child]. To find that [Defendant] showed a reckless disregard, you must find that [Defendant's] conduct was more than merely negligent or careless. Rather, you must find that [Defendant] caused or permitted a substantial and unjustifiable risk of serious harm to the safety or health of [Child.] A substantial and unjustifiable risk is one that any law-abiding person would recognize under similar circumstances and that would cause any law-abiding person to behave differently than [Defendant] out of concern for the safety or health of [Child.];
>         . . . .

15

**5. [Defendant's] conduct resulted in the death of [Child.]**

Medical neglect may be charged "when someone fails to seek or provide necessary medical care." *State v. Nichols*, 2016-NMSC-001, ¶ 34, 363 P.3d 1187. Medical neglect is defined as "failure to provide medical, dental, or psychiatric care that is necessary to prevent or to treat serious physical or emotional injury or illness." *Id.* (quoting *Black's Law Dictionary* 1196 (10th ed. 2014)). However, "[u]nder a theory of medical neglect that results in death or great bodily harm, the State must prove . . . that medical neglect was a significant cause of [the child's] death[.]" *Id.* ¶ 40. "Causation must be proved by substantial evidence." *Id.* ¶ 39. The State had the burden of proving that if Child had obtained medical care earlier, he "would have lived or at least would have had a significantly greater chance of living[.]" *Id.* ¶ 40.

**{23}** In its case in chief, the State presented the testimony of an emergency room doctor who was qualified to testify as an expert in the field of emergency pediatrics, as well as the testimony of an expert in forensic pathology. The emergency room doctor, Dr. Upham, testified that at the time Child arrived at the emergency room, he had no pulse, was not breathing, and showed no signs of life. Dr. Upham observed multiple bruises, an abrasion or laceration on Child's forehead and some skin discolorations on Child. He also noted that Child's abdomen was distended. The blood work Dr. Upham performed on Child indicated

16

that Child had lost blood from somewhere, but Dr. Upham did not observe any significant signs of blood loss from Child's exterior body. Child's distended abdomen, however, caused worry about blood in the abdomen.

{24}   Dr. Upham, testified that someone with an injury to his abdomen and internal bleeding "would initially be in pain and then [his] abdomen would get more and more distended with the blood and they'd be in a lot of pain." "[E]ventually, [the pain would be so bad that he] would pass out and eventually die." Dr. Upham, however, was never asked and did not testify about how long Child may have been losing blood, how long it would take for pain to develop or for Child to pass out and die from an abdominal injury with internal bleeding. When questioned regarding the actual time of Child's death in relation to the time Child was actually pronounced dead, Dr. Upham responded,

> I think you could argue not to have done any more resuscitation; that EMS providers had done what sounded like at least half an hour of resuscitation without any signs of life. He showed up dead. . . . I think you could make an argument that he was dead on arrival[.]

Dr. Upham opined that Child had been dead for less than four hours because the body did not show any signs of rigor mortis.

{25}   The forensic pathologist, Dr. Ukpo, determined that the cause of death was blunt trauma. According to Dr. Ukpo, twenty-five percent of Child's blood volume had pooled inside his abdomen, Child's abdominal muscles and intestines showed signs of bleeding and bruising, and Child's diaphragm and muscles associated with

17

the lower ribs also showed signs of hemorrhage and bruising. His major organs, such as the liver, spleen, and kidneys, however, showed no sign of injury. Dr. Ukpo was unable to identify the exact source of the blood found in Child's abdomen, but opined that trauma had probably damaged small blood vessels "associated with soft tissue or connective tissue" such as the fat connected to the intestines or tissues around the pancreas.

{26} Dr. Ukpo stated that because the amount of blood loss did not come from any apparent large source, he could not determine the exact amount of time it would take for that amount of blood to accumulate in the body: "I can't speak to the exact length of time given that it's a small blood vessel, and I don't know how long that blood vessel would leak, other than to estimate an hour or hours." The State then asked Dr. Ukpo, "in your opinion, is it possible that [Child]'s life could have been saved?" Defense counsel objected, and during a bench conference, argued, "He's not an ER doctor. He examines dead people. He can testify about the cause of death, manner of death. If he wanted to ask this question, talk to the ER doctor. This is . . . outside the scope of the expertise for this doctor." The district court responded by stating, "I mean, I don't know that there's any foundation laid for him to ask the question. If he can lay the foundation, I guess I'll make a decision about it at that point." The parties then debated the appropriate steps to be taken in establishing a foundation:

18

[State]: I'll just ask another question.

The Court: Okay.

[Defense counsel]: Ask him a question for foundation?

[State]: I'm going to ask him about the golden rule.

The Court: I'm Sorry?

[State]: There's a rule of thumb called "the golden rule," and that is if somebody gets medical attention within an hour, then his chances of survival are significantly increased. . . .

The Court: Is there any scientific—I mean, are you going to posit that as the basis for the question and the answer?

[State]: Yeah.

The Court: You'll need to lay some foundation. . . .

[Defense counsel]: Just for the record, Your Honor, he's already said that he can't place—he places time of death of less than days, but hours, up to twelve hours, in his pretrial interview, so just—

The Court: Again, I just don't know, without more foundation, that he could be qualified to answer that question, unless you provide more foundation.

19

Following the bench conference, the State asked Dr. Ukpo, "are there certain guidelines that you—physicians would follow as to when medical attention should be sought?" Dr. Ukpo explained that the "golden hour" in emergency medicine exists when someone sustains a traumatic injury outside of a hospital, because that person's "chance of survival is greatest if they get to the hospital within the first hour of injury," and after that, chances of survival "drop significantly." The State asked no follow-up questions regarding the golden hour rule as it pertained to Child, causation, or Child's chances of survival had he received medical attention sooner, and it did not seek to re-call Dr. Upham, the emergency room doctor, to testify about whether Child's condition was treatable and whether his chances of survival would have improved if he had received medical attention earlier.

{27} In *Nichols*, the defendant was convicted of child abuse by medical neglect following the death of his six-month-old son. 2016-NMSC-001, ¶ 1. He appealed, claiming insufficient evidence of causation to support his conviction. *Id.* ¶ 27. The evidence presented at trial was that the child died from a severe liver laceration, and that while it was possible to survive such an injury, survival would have been unlikely under the circumstances without extensive medical intervention. *Id.* ¶¶ 41-42. Our Supreme Court held that "[u]nder a theory of medical neglect that results in death or great bodily harm, the [s]tate must prove more than just the neglect itself." *Id.* ¶ 40.The state is required to prove by substantial evidence that "medical

20

neglect was at least a significant cause of [the child's] death or great bodily injury." *Id.* To do so, our Supreme Court held in *Nichols*, the state must provide "medical evidence that if [the defendant] had obtained medical care [for the child] earlier, [the child] would have lived or at least would have had a significantly greater chance of living[.]" *Id.* The state's evidence that it was possible to survive the injury sustained by the child if properly treated, our Supreme Court concluded in *Nichols*, did not shed any light on "when that intervention would have been necessary to save [the child] or give him an appreciably better chance of survival." *Id.* ¶ 43. "Without such testimony, the jury was left to speculate that if [the defendant] . . . had called 911 sooner, then perhaps the doctors would have had time to diagnose [the child] and treat him successfully." *Id.* ¶ 44.

> [A] suggestion that 'maybe' or 'perhaps' something would or would not have happened, even if based on evidence, is not probative of anything. It is certainly not probative beyond a reasonable doubt . . . [of] the statutory element included in the jury instruction that [the defendant's] actions or failure to act resulted in the death of or great bodily harm to [the child].

*Id.* ¶ 45. The evidence being insufficient, the defendant's conviction was reversed and the charges against him were vacated. *Id.* ¶ 47.

{28}    Applying *Nichols*, we conclude that the State did not present sufficient evidence to establish that Defendant's failure to obtain medical treatment for Child resulted in his death. *See id.* ¶ 40. The State did provide a factual basis for the jury

21

to conclude that Child's blood loss may have occurred over an extended period of time and that generally, people who sustain traumatic injuries are more likely to survive if they are treated within an hour of the injury. It did not, however, provide any evidence that Child's injuries were treatable, that Child's life would have been saved or that he would have had a better chance of survival with timely medical intervention, or when that intervention would have been necessary to improve his chances of survival. The State failed to ask Dr. Upham or any other medical expert whether Child's condition was treatable, and if so, when such treatment or medical intervention was necessary to save Child or give him an appreciably better chance of survival. *See id.* ¶ 43. The State did try to satisfy its causation requirement with the testimony of its forensic pathologist, Dr. Ukpo, by asking him about the "golden hour." However, the State offered no evidence that Dr. Ukpo was qualified to testify about the treatability of Child's injuries, when that intervention would have been necessary to treat Child, and whether such treatment would have given Child an appreciably better chance of survival. Dr. Ukpo's discussion of the "golden rule" was purely hypothetical and presented a general concept. The State failed to present any evidence that applied that general concept to the facts of this case. In fact, in its closing argument, the State actually argued that it did not need to present any evidence that if Defendant had acted to obtain medical treatment for Child, that Child would have lived or would have had a better chance at survival.

Without such testimony, even considering the evidence in the light most favorable to the guilty verdict, the State failed to prove one of the necessary elements of its case, and the jury was left to speculate whether Child "would have lived or at least would have had a significantly greater chance of living" if Defendant had called 911 sooner. *Id.* Given these significant deficiencies in the State's case, we have no choice but to reverse.

{29} The State suggests, in a footnote, that in the event the evidence of causation is insufficient to support Defendant's conviction for child abuse resulting in death, "the appropriate remedy is to remand for resentencing on the lesser included offense of third degree endangerment of a child (not resulting in death) under [Section] 30-6-1(E)." Defendant responds merely by stating he "does not agree," because "there is insufficient evidence for that offense as well." To support its argument, the State cites *State v. Haynie*, 1994-NMSC-001, ¶ 4, 116 N.M. 746, 867 P.2d 416, in which our Supreme Court reversed the defendant's conviction due to insufficient evidence and remanded for entry of judgment and resentencing for the lesser-included offense. The State does not, however, acknowledge or address the subsequent case of *State v. Villa*, 2004-NMSC-031, 136 N.M. 367, 98 P.3d 1017, in which the Supreme Court limited the application of the direct-remand rule set out in *Haynie* by disallowing resentencing on the lesser-included offense where

23

"the parties did not request and the jury was not tendered an instruction on any lesser-included offenses." *Villa*, 2004-NMSC-031, ¶¶ 9, 13-15, 18.

{30} Aside from its failure to properly apprise this Court of the relevant case law, the State does not explain how it satisfied the requirements set out in *Villa*, failing to provide any record citations demonstrating that the jury was adequately instructed on a lesser-included offense, failing to identify the specific lesser-included offense for which it sought remand, and failing to identify where in the record the parties argued the merits of that offense during trial. *See id.* The deficiencies in the State's argument are particularly problematic in light of the extensive record in this case, as well as the numerous alternatives to each of the many counts that the State charged. *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (declining to entertain a cursory argument that included no explanation of the party's argument and no facts that would allow the Court to evaluate the claim). Any attempt on our part to ascertain its intended argument would be speculative, at best. We therefore decline to consider the State's argument regarding its requested relief, and instead remand for the district court to vacate Defendant's conviction for child abuse resulting in death. *See State v. Slade*, 2014-NMCA-088, ¶¶ 38-42, 331 P.3d 930.

**3.     Child Abuse Not Resulting in Death**

24

{31} The State charged Defendant with child abuse, alleging Defendant caused several scars that were found on Child's body at the time of his death. Dr. Ukpo testified that those scars appeared waxy and orange in color, and microscopic evaluation revealed they were consistent with a "thermal injury." When asked about Child's scars, Defendant told law enforcement that Child got a single small red mark on his chest when, a few days before his death, Child ran into Defendant's lit cigarette while running down the hallway. One paramedic described the scars as being similar to injuries sustained when people hold lighted cigarettes on their skin. When asked whether those scars could have been caused by a child running down a hallway and bumping into someone holding a cigarette, Dr. Ukpo opined, "[w]ith that scenario, I would expect one [scar]. In this situation, I saw three."

{32} The jury was instructed that the State had to prove, beyond a reasonable doubt, the following elements:

    1. [Defendant] burned [Child] on the chest;
    2. By engaging in the conduct described in Paragraph 1, [Defendant] caused or permitted [Child] to be tortured or cruelly confined or cruelly punished;
    3. [Defendant] showed a reckless disregard for the safety or health of [Child].

The jury convicted Defendant of child abuse.

{33} Defendant argues that the evidence suggests the burn marks that gave rise to the conviction were the result of an accident. The jury was free to reject

25

Defendant's version of events, particularly in light of the inconsistencies between Defendant's explanation and the testimony describing Child's multiple scars. *Cf. State v. Galindo*, 2018-NMSC-021, ¶ 12, 415 P.3d 494 ("The jury was free to credit certain evidence that did not support [the d]efendant's explanation of [the child's] injuries. . . . The jury also could have found that [the d]efendant was not credible because of inconsistencies between his explanation of [the child's] injuries and the medical evidence[.]"). Defendant's challenges, based on the number of times or intentionality of the act, do not render the evidence insufficient. From the evidence presented, the jury could reasonably conclude that Defendant burned Child with his cigarette. The jury could conclude from the number of similar burn marks that the conduct amounted to torture or cruel punishment. The multiple similar burn marks in conjunction with Defendant's admission that he burned Child with a cigarette on the chest once is sufficient for the jury to reasonably conclude that Defendant acted in a way that was more than mere negligence or carelessness and amounted to a reckless disregard for Child's health or safety. The evidence was therefore sufficient to support Defendant's conviction.

**4.      Tampering With Evidence**

{34}      The State charged Defendant with tampering for having placed Child in the shower prior to law enforcement's arrival at the home. During trial, Child's younger sibling testified that there was blood on Child, yet an emergency room

26

nurse testified that Child's body was "really clean" when he arrived at the hospital. Law enforcement personnel testified that when they arrived at the home, the bathroom "was slightly wet, as if someone had exited the shower." While Defendant freely and repeatedly admitted that he put Child in the shower, insisting that he had done so in an attempt to revive Child, he also admitted that he did not call 911 immediately because he was "scared" and "paranoid." Based on this evidence, the jury was instructed that the State had to prove, beyond a reasonable doubt, that Defendant cleaned Child and that Defendant "intended to prevent the apprehension, prosecution or conviction of himself" or Child's mother. The jury convicted defendant of tampering.

{35}    It is uncontroverted that Defendant committed the overt act of placing Child in the shower. Defendant, however, seeks to draw a distinction between cleaning Child and placing him in the shower, suggesting that the former is indicative of an intent to prevent apprehension, while the latter is not. The jury could reasonably infer that it was Defendant's act of placing Child in the shower that resulted in his being "really clean" upon arrival at the emergency room. As such, the evidence was sufficient to support a conclusion that Defendant cleaned Child.

{36}    Where there is no "evidence of the specific intent of the defendant to disrupt the police investigation, intent is often inferred from an overt act of the defendant." *State v. Duran*, 2006-NMSC-035, ¶¶ 14, 16, 140 N.M. 94, 140 P.3d 515

27

("Statements by defendants and witnesses regarding the disposition of evidence may allow a jury to reasonably infer an overt act and intent, as may other kinds of circumstantial evidence[.]"); *see also State v. Silva*, 2008-NMSC-051, ¶ 18, 144 N.M. 815, 192 P.3d 1192 (acknowledging that "intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence" (alteration, internal quotation marks, and citation omitted)). Defendant argues there was no evidence to support a conclusion that he intended to avoid apprehension by placing Child in the shower, citing *Silva*, as support for this argument. In *Silva*, our Supreme Court concluded that there was insufficient evidence to support a tampering conviction where the defendant possessed a gun, and the police were unable to find the gun used in the murder at issue in the case. *Id.* ¶ 19. The *Silva* court pointed out that it was improper for the state to have "effectively asked the jury to speculate that an overt act of hiding the murder weapon had taken place, based solely on the fact that such evidence was never found." *Id.* (omission, alteration, internal quotation marks, and citation omitted). We are unpersuaded by Defendant's attempt to compare this case to *Silva* by emphasizing that there was no evidence that Child's blood had been found anywhere in the house, asserting that absent such evidence, there is no reason to believe Defendant placed Child in the shower intending to clean him, and concluding that without such evidence, there could be no inference that he intended

28

to avoid apprehension. There is uncontroverted evidence that Defendant committed an overt act from which the jury could reasonably infer that he intended to prevent apprehension of himself or Child's mother. Although this is certainly not the only inference that a jury could reasonably draw from the evidence, it is a permissible one, and the evidence is therefore sufficient to support Defendant's tampering conviction. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts."). Furthermore, the fact that the witness who testified to having seen blood on Child—Child's younger sibling—was a child is not relevant to our sufficiency analysis, despite Defendant's cursory assertion that her testimony was neither reliable nor competent, because we do not reweigh the evidence presented to the jury. *See Mora*, 1997-NMSC-060, ¶ 27.

**5.      Intimidation of a Witness**

{37}      Defendant initially denied having coached Child's siblings on what to say about the incident, but later admitted that he told both of Child's younger siblings, "[d]on't say nothing. Everything's going to be okay. Don't say nothing." Only one of Child's younger siblings testified, admitting that Defendant sometimes scared her, but denying that anyone had asked her not to talk about the events of the day Child died. We do not concern ourselves with the potential conflict in this

evidence. *See State v. Rael-Gallegos*, 2013-NMCA-092, ¶ 8, 308 P.3d 1016 ("It is for the fact-finder to evaluate the weight of the evidence, to assess the credibility of the various witnesses, and to resolve any conflicts in the evidence; we will not substitute our judgment as to such matters." (alteration, internal quotation marks, and citation omitted)); *see also State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314 ("The fact[-]finder may reject [a] defendant's version of the incident."). Instead, we focus on whether Defendant's statement to police, in conjunction with the sibling's statement that Defendant sometimes scared her, was enough for the jury to conclude Defendant "knowingly intimidated or threatened with the intent to keep [the siblings] from truthfully reporting to a law enforcement officer . . . information relating to: the commission or possible commission of [c]hild [a]buse[,]" per the instructions given at trial. We conclude that it was. The jury could reasonably conclude that Defendant's ability to scare the sibling outweighed her denial that anyone had told her to keep quiet about what happened to Child. When considered with Defendant's own admission that he told both children to keep quiet about the events, the evidence is sufficient to support the guilty verdict.

{38}    Defendant argues that the capacity of the children played some part in whether he could be convicted of one count per child. The instruction required a knowing intimidation or threat, with intent. *See Vargas*, 2016-NMCA-038, ¶ 27

30

("We measure the sufficiency of the evidence against the instructions given to the jury."). Nowhere does the instruction mention the capacity of the person receiving the threat, or require that the person understand, comprehend, or acknowledge receipt of the threat. Further, Defendant makes no assertion that the statement of law contained in the instruction given to the jury was inadequate or a misstatement of the law. We therefore find Defendant's argument on this point unpersuasive, particularly in light of his failure to cite to any supporting authority. *See Headley*, 2005-NMCA-045, ¶ 15 (declining to address argument where no authority is presented in support of an argument).

**E.     Cumulative Error**

{39}     Defendant's final argument is that his convictions should be overturned because the cumulative effect of the district court's errors denied him of a fair trial. "The doctrine of cumulative error requires reversal when a series of lesser improprieties throughout a trial are found, in aggregate, to be so prejudicial that the defendant was deprived of the constitutional right to a fair trial." *State v. Duffy*, 1998-NMSC-014, ¶ 29, 126 N.M. 132, 967 P.2d 807, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110. Of the various assertions of error that Defendant makes, we have identified only one meritorious assertion of error and are reversing based upon insufficient evidence as to that count. Because there were no other errors that do not by themselves require

31

reversal, we conclude that there was no cumulative error. *Cf. State v. Carrillo*, 2017-NMSC-023, ¶ 53, 399 P.3d 367 (rejecting cumulative error claim where only one error occurred at trial and that error was harmless). The State's failure to prove a single element of a single count—the only error that we have found in this case— was not so prejudicial that Defendant's was deprived of a fair trial. We therefore reject Defendant's cumulative error claim. *See State v. Trujillo*, 2002-NMSC-005, ¶ 63, 131 N.M. 709, 42 P.3d 814 (stating that the cumulative error doctrine is strictly applied, and may not be successfully invoked if the record as a whole demonstrates that the defendant received a fair trial).

**CONCLUSION**

{40}   We remand for the district court to vacate Defendant's conviction for child abuse resulting in death, and affirm the remaining convictions.

{41}   **IT IS SO ORDERED**.

_____
**JULIE J. VARGAS, Judge**


**WE CONCUR:**


_____
**STEPHEN G. FRENCH, Judge**


_____
**EMIL J. KIEHNE, Judge**

32