# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2022-NMCA-007**

**Filing Date: October 1, 2021**

**No. A-1-CA-37888**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**MATTHEW CHAVEZ,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Cristina T. Jaramillo, District Judge**

Certiorari Granted, January 13, 2022, No. S-1-SC-39058. Released for Publication March 1, 2022.

Hector H. Balderas, Attorney General
Santa Fe, NM
Lauren J. Wolongevicz, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Steven J. Forsberg, Assistant Appellate Defender
Albuquerque, NM

for Appellant

## OPINION

**IVES, Judge.**

**{1}** This case involves an attempted robbery gone horribly awry. The State accused Defendant Matthew Chavez of, among other things, attempting to rob Tyler Lackey and then, in the fracas that ensued, murdering him. At trial, Defendant did not dispute that he shot and killed Mr. Lackey, and the State did not dispute that Mr. Lackey was pointing his own gun at Defendant immediately before Defendant shot Mr. Lackey.

Defendant claimed he acted in self-defense and defense of another, but the jury rejected those claims and found him guilty of second degree murder.

**{2}** On appeal, Defendant argues that the district court erred by denying his request for a jury instruction on voluntary manslaughter. This error, Defendant claims, prevented the jury from deciding whether the killing was voluntary manslaughter—an act of *imperfect* self-defense—rather than murder. *See generally State v. Abeyta*, 1995-NMSC-051, ¶¶ 13-20, 120 N.M. 233, 901 P.2d 164 (explaining that a "claim of imperfect self-defense . . . presents an issue of mitigating circumstances that may reduce murder to manslaughter"), *abrogated on other grounds by State v. Campos*, 1996-NMSC-043, ¶ 32 n.4, 122 N.M. 148, 921 P.2d 1266.

**{3}** We agree. New Mexico law required the district court to instruct the jury on voluntary manslaughter, and the court's failure to do so deprived Defendant of a fair trial. Whether Defendant committed voluntary manslaughter rather than murder was a question for the jury, and the district court erred by deciding, as a matter of law, that the killing was not voluntary manslaughter. This error requires us to reverse Defendant's second degree murder conviction, as well as his convictions for tampering with evidence of second degree murder and conspiracy to tamper with evidence, and to remand for a new trial for second degree murder, voluntary manslaughter, tampering with evidence, and conspiracy to tamper with evidence.

**{4}** We also agree with Defendant that the district court erred by allowing a law enforcement officer to testify as to her opinion about whether a video recording showed that Defendant was carrying a firearm while trying to rob Mr. Lackey. Because this opinion testimony was not helpful to the trier of fact, it should not have been admitted.

**{5}** Finally, we reject Defendant's argument that all of the charges against him should have been dismissed with prejudice because his trial was untimely under the Interstate Agreement on Detainers (IAD).

## BACKGROUND

**{6}** At trial, the State introduced video recordings of the encounter between Defendant and Mr. Lackey, which occurred in February 2016. The recordings do not include any audio, and the video is of limited use because of the camera perspectives and video quality. However, the videos collectively provide a general overview of what transpired.

**{7}** Defendant's girlfriend, Veronica Trimble, emerged from the front passenger door of an orange and white sedan that was backed into a parking space. Approximately two minutes later, Ms. Trimble returned to the car and got back into the passenger's seat, and a white pickup truck pulled into the parking lot and parked in a space parallel to an ATM at the end of the lot. As the truck's driver, Mr. Lackey, exited the vehicle and walked toward the ATM, the white and orange sedan pulled out of its parking space, drove across the lot toward the exit, and stopped perpendicular to the truck and the

ATM, approximately two car lengths away. Defendant exited the car through the driver's door and walked toward the ATM, approaching Mr. Lackey from behind. Mr. Lackey looked over his left shoulder and then inserted his card into the ATM. He again turned to his left and looked behind him, where Defendant, wearing a mask, was standing. Defendant's left hand was in his pocket. Mr. Lackey turned toward Defendant and drew a handgun. Defendant returned to the car he had been driving and got back into the driver's seat, and Mr. Lackey pursued him with his gun drawn. The door on the driver's side of the car closed, then opened again, as Mr. Lackey and his companion, Justin Overton, stood near the driver's side door, with Mr. Lackey pointing his gun at Defendant all the while. Approximately one minute and twenty seconds later, Defendant drove away as Mr. Lackey fell to the ground.

**{8}** Although the police never found the gun that Defendant used to shoot Mr. Lackey, they did find a .380 semiautomatic pistol on the right side of Mr. Lackey's body, near his head. The pistol contained five R-P brand .380 bullets—one in the chamber and four in the magazine. A single R-P .380 bullet casing was found near Mr. Lackey's left foot.

**{9}** Mr. Lackey's autopsy confirmed that gunshot wounds caused his death. The medical examiner observed two bullet holes, one in Mr. Lackey's chest and another in his upper abdomen, and found two bullets lodged in his back. The examiner determined that the manner of death was homicide.

**{10}** Because Defendant conceded that he fired the fatal shots, the key questions at trial as to the killing were whether it was a crime at all and, if so, whether it was first degree murder or a less serious offense. The answers to those questions turned on exactly what happened during the encounter. To help the jury fill in the gaps left by the video recordings and physical evidence, the parties relied on the testimony of several witnesses. The most significant eyewitnesses for the purposes of this appeal were Mr. Overton, Ms. Trimble, and Randy Ulibarri, a construction supervisor who was spending the night at a nearby construction site. We summarize the testimony of each eyewitness in turn.

**{11}** Mr. Overton, who was Mr. Lackey's best friend, testified that shortly before the encounter with Defendant, the two men were eating dinner at a restaurant in Albuquerque and then drove to a nearby ATM to get money to tip the waitperson. When they arrived, Mr. Lackey parked the truck, got out, and approached the ATM to withdraw money. Mr. Overton testified that he did not see Defendant holding a gun at the ATM but that Defendant had his hands in his pockets and might have had a weapon in his pocket. Mr. Overton believed that Defendant was trying to rob Mr. Lackey and that Mr. Lackey was in danger. Mr. Lackey drew his .380 pistol, and Defendant ran back to his car, got inside, and closed the door, as Mr. Lackey followed him. From Mr. Overton's perspective, it did not appear that Defendant "was trying to get away" when he ran to his car. Mr. Overton believed that Mr. Lackey "was trying to stop" Defendant, not "trying to hurt" him.

**{12}** Mr. Overton testified that he exited the truck, approached the car, and, when Mr. Lackey was "fairly close to" the car with his gun pointed at Defendant, Mr. Overton brandished a pocketknife. Holding the knife at his side in order to protect his friend, Mr. Overton came within approximately three feet of Defendant. Mr. Lackey repeatedly yelled at Defendant, "Get out of the vehicle[!]" Mr. Lackey was in "the shooter stance[,]" pointing his gun at Defendant. Defendant repeatedly responded, "We're just kidding. We're just playing[,]" and Ms. Trimble made similar statements. Defendant removed a gun from the car's center console and, within seconds, fired it two or three times and quickly drove away. Before Defendant removed the gun from the console, Mr. Overton had a clear view of Defendant's hands and had not seen a gun. Mr. Overton testified that he was certain that Mr. Lackey did not fire his gun.

**{13}** Mr. Overton described Defendant's behavior during the interaction at the car as "very nonchalant" and insincere. Mr. Overton believed that Defendant and Ms. Trimble had kept the conversation going to distract Mr. Overton and Mr. Lackey so that Defendant could get the gun, fire it, and speed off. Although Mr. Overton did not think Mr. Lackey intended to hurt Defendant, and Mr. Overton did not intend to do so, Mr. Overton did not know whether Defendant believed that. Mr. Overton's direct testimony was that Defendant feigned fear; he "tr[ied] to get out of the situation by acting scared." But on cross-examination, Mr. Overton acknowledged that, during a pretrial interview, he had said that Defendant "appeared nervous and scared."

**{14}** Ms. Trimble testified about a slightly longer time period, beginning with what occurred before the encounter at the ATM—an explanation of what was happening in the video recording before Mr. Lackey approached the ATM. Ms. Trimble testified that Defendant had initially parked his car in the parking lot where the ATM was because he wanted to rob a nearby restaurant. While Defendant sat in the car, Ms. Trimble entered the restaurant and, upon returning to the car, told Defendant that there were customers, including children in the restaurant, and that she was concerned that someone might be harmed in a robbery. As Defendant began to pull out of the parking lot, Ms. Trimble noticed a truck parked at the ATM, and Defendant stopped the car near the ATM, got out of the car, and walked up behind Mr. Lackey, who was using the ATM.

**{15}** Ms. Trimble heard yelling and then saw Defendant return to the car and get inside. She did not see a gun in Defendant's hand at that time. Mr. Lackey pursued Defendant and pointed his gun at Defendant while Mr. Lackey and Mr. Overton, who was armed with a knife, repeatedly demanded that Defendant get out of the car. Both Mr. Lackey and Mr. Overton were angry; they were yelling and using profane language. Defendant did not get out of the car. He appeared to be scared.

**{16}** Ms. Trimble feared for Defendant's well-being. She told him not to get out of the car and, to stop him from doing so, she leaned over the middle console from the passenger seat and put part of her body on Defendant's right leg. She also told Mr. Lackey that she was pregnant. Mr. Lackey said, "So you think you're going to rob me[?]" Defendant said, "No, I was just playing. Just let us leave. Just let us leave[,]" and "[w]e just want to leave[.]" Ms. Trimble believed that Defendant intended to leave. But, by

standing in the car's doorway with his gun pointed at Defendant, Mr. Lackey prevented them from leaving.

**{17}** Ms. Trimble saw a handgun on Defendant's lap, and, as Mr. Lackey held the car door open, Defendant drove away and fired his gun. Ms. Trimble testified on direct examination that she was not sure whether Mr. Lackey also fired, but that, if he did, she believed that he fired after Defendant did. On cross-examination, she testified that she was not sure who fired first.

**{18}** Mr. Ulibarri also testified about the sequencing of the shots. He stated that there were three shots, that the first shot came from the man outside of the car, and that the second and third shots came from inside the car. He testified to these facts during direct examination, cross-examination, and redirect examination, although he acknowledged that on the night of the shooting, he had written that he saw a flash inside the car and that one of the men outside the car returned fire.

**{19}** Detective Leah Acata also testified about the fatal encounter. Because Detective Acata was not present for any part of the encounter, her testimony about what occurred was based exclusively on her interpretation of the video recordings that were admitted into evidence. The first part of Detective Acata's testimony about the recordings drew no objections and remains uncontroversial on appeal; she described undisputed facts. The dispute on appeal pertains to Detective Acata's testimony that, based on her review of the videos, Defendant had a gun throughout the encounter and that he brandished it while standing near Mr. Lackey at the ATM.

**{20}** The district court instructed the jury on the essential elements of first degree murder and one lesser included offense, second degree murder. Although the district court granted Defendant's request for jury instructions on self-defense and defense of another, the court refused to instruct the jury on whether the shooting was an act of "imperfect self-defense." Such an instruction would have allowed the jury to determine whether the killing, even if it was not legally justified as an act of self-defense or defense of another, was a crime less serious than either first or second degree murder—namely, voluntary manslaughter. *See Abeyta*, 1995-NMSC-051, ¶¶ 13-20. Without Defendant's requested instruction, the jury had the following options as to the murder charge: find Defendant not guilty of any homicide offense because the killing was an act of self-defense or defense of another, find him guilty of first degree murder, or find him guilty of second degree murder.

**{21}** The jury found Defendant guilty of second degree murder in violation of NMSA 1978, Section 30-2-1(B) (1994), rejecting his claimed self-defense and defense-of-another justifications. And the jury specifically found that he used a firearm in the commission of the crime, enhancing the basic sentence for second degree murder. *See* NMSA 1978, § 31-18-16(A) (1993, amended 2020). The jury also found Defendant guilty of attempted robbery in violation of NMSA 1978, Sections 30-28-1(C) (1963) and 30-16-2 (1973); tampering with evidence in violation of NMSA 1978, Section 30-22-5(A), (B)(1) (2003); conspiracy to commit tampering with evidence in violation of Sections 30-

28-2(A), (B)(3) (1979) and 30-22-5(A), (B)(1); and receiving or transferring a stolen vehicle in violation of NMSA 1978, Section 30-16D-4(A), (B)(1) (2009). The district court entered judgment and sentenced Defendant to twenty-three-and-a-half years of imprisonment, including sixteen years for the second degree murder conviction and firearm enhancement.

**DISCUSSION**

**{22}** Defendant argues that (1) the district court erred by denying his request for a voluntary manslaughter instruction; (2) the evidence does not suffice to support his convictions for tampering with evidence and conspiracy to commit tampering with evidence; (3) the district court erred by admitting into evidence Officer Acata's testimony about whether a firearm was visible in a video recording that was an exhibit at trial; and (4) the district court erred by denying his motion to dismiss all of the charges against him with prejudice because his trial was not timely under the IAD. We accept his first and third claims of error and reverse his convictions for second degree murder, tampering with evidence, and conspiracy to commit tampering with evidence. We otherwise reject Defendant's claims of error. We therefore remand for a new trial for second degree murder, voluntary manslaughter, tampering with evidence, and conspiracy to tamper with evidence but affirm his remaining convictions.[1]

**I.      The District Court Erred by Denying Defendant's Request for a Jury Instruction on Voluntary Manslaughter**

**{23}** Whether the district court erred by denying Defendant's requested jury instruction on voluntary manslaughter is an issue of both law and fact that we review de novo, and in doing so we look at the evidence in the light most favorable to giving the requested instruction. *State v. Skippings*, 2011-NMSC-021, ¶ 10, 150 N.M. 216, 258 P.3d 1008. Because voluntary manslaughter is a lesser included offense of murder, *Abeyta*, 1995-NMSC-051, ¶ 17, our task is to determine whether there is any reasonable view of the evidence under which voluntary manslaughter was the highest degree of homicide committed. *Skippings*, 2011-NMSC-021, ¶ 10. In other words, if "a jury rationally could [have] acquit[ted]" Defendant of second degree murder but convicted him of voluntary manslaughter, then the district court erred by refusing to give Defendant's requested manslaughter instruction. *Id.* (internal quotation marks and citation omitted).

**{24}** Applying this standard of review entails two steps here. We begin by briefly describing the doctrine of imperfect self-defense under New Mexico law and the relationship between that doctrine and the offense of voluntary manslaughter. Then, using this legal lens to examine the evidence presented during Defendant trial, we

---

1Principles of double jeopardy bar retrial on the first degree murder charge. *See State v. Sosa*, 1997-NMSC-032, ¶ 33, 123 N.M. 564, 943 P.2d 1017 (recognizing that "[t]he jury's failure to convict" the defendant of two homicide charges, including first degree murder, "amount[ed] to an implicit acquittal of those charges" and concluding that double jeopardy barred retrial on those charges), *abrogated on other grounds by State v. Porter*, 2020-NMSC-020, ¶ 7, 476 P.3d 1201.

explain why it was error to deny Defendant's request for a jury instruction on voluntary manslaughter.

**{25}** Unlike self-defense, which justifies a homicide so that it is no crime at all, imperfect self-defense mitigates a homicide so that the crime is voluntary manslaughter rather than murder. *Abeyta*, 1995-NMSC-051, ¶¶ 14-17; *see also* § 30-2-1 (defining first and second degree murder); NMSA 1978, § 30-2-3(A) (1994) (classifying voluntary manslaughter as a third degree felony). In other words, the defense is imperfect from the accused's perspective because, even if it is pursued successfully, the outcome is not an acquittal. And, not surprisingly, this imperfect outcome occurs when a claim of self-defense suffers from an imperfection—a missing element. Self-defense's three elements are: "(1) an appearance of immediate danger of death or great bodily harm to the defendant, (2) the defendant was in fact put in fear by the apparent danger, and (3) a reasonable person in the same circumstances would have reacted similarly." *Abeyta*, 1995-NMSC-051, ¶ 14. The absence of the third element renders the defense imperfect. If the accused reacts *unreasonably* to fear caused by an appearance of danger of death or great bodily harm, a claim of self-defense will fail, but a claim of imperfect self-defense might still succeed. *Id.* ¶ 17. To prevail on a claim of imperfect self-defense and reduce the gravity of the offense from second degree murder to voluntary manslaughter, the accused's reaction to the fear of death or great bodily harm, though unreasonable, must be "a result of sufficient provocation[.]" UJI 14-220 NMRA; *State v. Jernigan*, 2006-NMSC-003, ¶ 18, 139 N.M. 1, 127 P.3d 537 ("[V]oluntary manslaughter is second[]degree murder committed with sufficient provocation."); *see also Abeyta*, 1995-NMSC-051, ¶ 17 n.4 (explaining that a manslaughter instruction is the means of submitting a claim of imperfect self-defense to the jury).

**{26}** This brings us to the ultimate question: Would the evidence in Defendant's case, viewed in the light most favorable to giving his requested instruction, allow a jury to find him not guilty of second degree murder but find him guilty of voluntary manslaughter because he killed Mr. Lackey based on sufficient provocation? *Cf. Jernigan*, 2006-NMSC-003, ¶¶ 23-25. Our answer is yes. The district court erred by determining, as a matter of law, that the evidence could not support a finding of sufficient provocation. The evidence raised a question of fact for the jury about whether Mr. Lackey sufficiently provoked Defendant by holding him at gunpoint while preventing him from fleeing. And, contrary to the State's argument on appeal, the evidence that Defendant initiated the encounter did not preclude Defendant from presenting the provocation theory to the jury. We explain each point in turn.

**{27}** Viewing the evidence in the light most favorable to instructing the jury on sufficient provocation, we conclude that a rational jury could have found that Defendant acted based on sufficient provocation. New Mexico law defines provocation to include "any action, conduct or circumstances which arouse anger, rage, *fear*, sudden resentment, *terror* or other extreme emotions." UJI 14-222 NMRA (emphases added). However, not all provocation that causes the accused to have such emotional reactions will do. To suffice, "[t]he provocation must be such as would affect the ability to reason

and to cause a temporary loss of self[-]control in an ordinary person of average disposition." *Id.* "Whether a particular set of circumstances is sufficient provocation is generally a question for the jury to decide." *State v. Munoz*, 1992-NMCA-004, ¶ 6, 113 N.M. 489, 827 P.2d 1303. This generalization holds true in Defendant's case; the jury, rather than the judge, should have determined whether sufficient provocation existed. Key facts were undisputed: Mr. Lackey drew a gun, pointed it at Defendant, pursued Defendant to his car, and held him at gunpoint while demanding that he get out of the car. Although the parties disputed how to interpret the conduct of Mr. Lackey and Defendant and disputed other circumstances surrounding the shooting, we must view the evidence in the light most favorable to Defendant. *See Skippings*, 2011-NMSC-021, ¶ 10. Viewed in that light, the evidence could have allowed the jury to find that, when Defendant returned to the car and got into the driver's seat, he intended to retreat from Mr. Lackey; that Mr. Lackey held the car door open while angrily yelling commands and using profanity; and that Defendant retrieved a gun from the car and ultimately fired it at Mr. Lackey because Defendant was afraid that Mr. Lackey would shoot him. If the jury accepted this version of events, the jury could have determined that Mr. Lackey's conduct placed Defendant in fear, or even terror, that Mr. Lackey would seriously injure or kill Defendant and that Mr. Lackey's conduct would adversely impact the ability of an ordinary person of average disposition to reason and exercise self-control. This would amount to sufficient provocation, even if the jury determined that the force that Defendant used was unreasonable. *See Abeyta*, 1995-NMSC-051, ¶ 17.

**{28}** Precedent confirms that the evidence of provocation warranted a voluntary manslaughter instruction in Defendant's case. Our Supreme Court has concluded that less compelling evidence sufficed. In *Jernigan*, the Court reached that conclusion based on evidence that the person the defendant shot was reaching for his crotch area— conduct the defendant interpreted as an effort to get a gun with which to shoot the accused. 2006-NMSC-003, ¶¶ 5, 25 (reversing an attempted second degree murder conviction and concluding that the district court erred by denying the defendant's request for a jury instruction on attempted voluntary manslaughter); *cf. State v. Wright*, 1934-NMSC-056, ¶¶ 4-8, 38 N.M. 427, 34 P.2d 870 (concluding that testimony that the defendant was afraid that the person he shot would get a gun sufficed to support the defendant's conviction for voluntary manslaughter). Because precedent establishes that the accused's belief that a gun *might* be drawn and then used in a confrontation raises a jury question about whether the accused was sufficiently provoked, we conclude that a jury question also existed in Defendant's case based on evidence that Mr. Lackey actually drew a gun and pointed it at Defendant, that Defendant returned to his vehicle with Mr. Lackey in pursuit, that Mr. Lackey then held Defendant at gunpoint while angrily yelling, and that Defendant appeared to be scared shortly before he fired his gun at Mr. Lackey.

**{29}** Having concluded that the evidence presented a jury question as to whether Mr. Lackey's conduct amounted to sufficient provocation, we turn next to the State's argument that New Mexico law barred Defendant from presenting his provocation theory to the jury. Specifically, the State argues that the evidence that Defendant initiated the conflict with Mr. Lackey at the ATM barred Defendant from pursuing his

theory that Mr. Lackey's subsequent actions amounted to provocation. The parties correctly focus their arguments on appeal, as they did at trial, on *State v. Gaitan*, 2002-NMSC-007, 131 N.M. 758, 42 P.3d 1207, in which our Supreme Court stated the governing rule: "the law does not permit one who intentionally instigates an assault on another to then rely on the victim's *reasonable response* to that assault as evidence of provocation sufficient to mitigate the subsequent killing of the victim from murder to manslaughter." *Id.* ¶ 13 (emphasis added).

**{30}** Even if we assume there was no jury question as to whether Defendant "intentionally instigate[d] an assault" through his actions at the ATM, *id.*, we conclude that the evidence raised a question for the jury about whether Mr. Lackey responded reasonably. Based on the conflicting testimony about exactly how Mr. Lackey and Defendant behaved during the encounter and the different ways of interpreting the behavior of the two men, the jury could have rationally accepted a variety of narratives. And depending on which narrative the jury accepted, the jury could have concluded that Mr. Lackey's response was reasonable or unreasonable.

**{31}** Some narratives suggest that Mr. Lackey responded reasonably, including by using a reasonable amount of force, in exercising his right to defend himself or his right to make a citizen's arrest. *See id.* (recognizing that no problem of provocation exists if the accused attacks the victim and the victim reacts "with no more force than he is privileged by law to use for his own protection" (internal quotation marks and citation omitted)); *cf. State v. Johnson*, 1996-NMSC-075, ¶¶ 1, 18, 122 N.M. 696, 930 P.2d 1148 (holding that when a defendant who is charged with assault seeks a jury instruction based on a theory of citizen's arrest, the defendant must present evidence that, among other things, "the defendant acted with reasonable force under the circumstances"); *Downs v. Garay*, 1987-NMCA-108, ¶ 18, 106 N.M. 321, 742 P.2d 533 (recognizing, in the context of a tort claim, that "the privilege[s] of citizen's arrest[ and] self-defense[ are] limited to the use of *reasonable* force" (emphasis added)). The State offers an example of a self-defense narrative in its answer brief, asserting that Defendant accosted Mr. Lackey at the ATM with a gun; that Mr. Lackey reasonably believed that he was in danger and responded by drawing his gun; and that Defendant returned to his car but remained armed throughout and continued to pose a deadly threat to Mr. Lackey until he fired his gun at Mr. Lackey and sped away. Although this is a rational way of resolving the factual disputes and interpreting the undisputed facts, what matters for our purposes is that it is not the *only* rational way of doing so. The question we must answer is not whether there is a rational view of the evidence that would have allowed the jury to find that Mr. Lackey acted reasonably and therefore reject the imperfect self-defense theory. Instead, we must determine whether there is a rational view of the evidence under which the jury could have found that Mr. Lackey acted unreasonably. *See Skippings*, 2011-NMSC-021, ¶ 10 (requiring the appellate court to ask whether a jury "rationally could [have] acquit[ted]" the defendant of the more serious offense and found the defendant guilty of the less serious offense for which the defendant sought a jury instruction (internal quotation marks and citation omitted)).

**{32}** We conclude that there is. Specifically, a jury could have found that Mr. Lackey's conduct went beyond the bounds of legally justified self-defense or citizen's arrest, either because Mr. Lackey used unreasonable force, *see Gaitan*, 2002-NMSC-007, ¶ 13; *cf. Downs*, 1987-NMCA-108, ¶ 18, by pursuing Defendant with gun drawn and holding him at gunpoint or because his purpose was not to hold Defendant for the authorities but instead to engage in the kind of unreasonable self-help that amounts to vigilantism. *Cf. Johnson*, 1996-NMSC-075, ¶ 18; *State v. Emmons*, 2007-NMCA-082, ¶ 19, 141 N.M. 875, 161 P.3d 920. For example, a rational jury could have found that Defendant was not armed at the ATM; that, after Mr. Lackey drew his gun at the ATM, Defendant retreated to the car; that Defendant's actions indicated that he intended to withdraw from the encounter peacefully; but that Mr. Lackey nevertheless kept his gun drawn and pursued Defendant to the car and held Defendant, who was still unarmed, at gunpoint while Mr. Lackey loudly and profanely demanded that Defendant get out of the car. If a jury accepted this narrative, it could have determined that (1) Mr. Lackey acted unreasonably because the force he used was excessive or because his purpose was not to detain Defendant until police arrived but instead to exact justice himself, and (2) it was reasonable for Defendant to have had an extreme emotional response to Mr. Lackey's conduct that, in turn, caused Defendant to lose self-control and act unreasonably in shooting Mr. Lackey. *See generally State v. Johnson*, 1998-NMCA-019, ¶ 16, 124 N.M. 647, 954 P.2d 79 (recognizing that "reasonableness in the use of force is generally a matter for the jury"); *cf. State v. Wasson*, 1998-NMCA-087, ¶ 12, 125 N.M. 656, 964 P.2d 820 (explaining that intent is "generally . . . a question of fact for a jury to decide"). We therefore conclude that the evidence that Defendant initiated the encounter did not preclude him from presenting to the jury his theory that Mr. Lackey's unreasonable response amounted to provocation sufficient to mitigate the killing to voluntary manslaughter.

**{33}** Because the evidence, viewed favorably to Defendant, could have allowed a rational jury to conclude that Defendant shot Mr. Lackey as a result of sufficient provocation, the district court erred by prohibiting him from presenting his imperfect self-defense theory to the jury by way of a voluntary manslaughter instruction. We therefore reverse Defendant's second degree murder conviction and remand for a new trial on that charge. *See State v. Brown*, 1996-NMSC-073, ¶ 34, 122 N.M. 724, 931 P.2d 69 ("When evidence at trial supports the giving of an instruction on a defendant's theory of the case, failure to so instruct is reversible error.").

## II. The Jury Instruction Error Also Requires a New Trial on the Tampering and Conspiracy Charges

### A. Tampering with Evidence

**{34}** Our reversal of Defendant's second degree murder conviction requires us to reverse his conviction for third degree tampering with evidence because of the relationship between the two charges. The jury found Defendant guilty of tampering with evidence and returned a special verdict form finding that he committed that crime in relation to first or second degree murder. Pursuant to Section 30-22-5(B)(1), under which tampering with evidence is a third degree felony when it relates to a first or

second degree felony, the district court entered a judgment of conviction for third degree tampering with evidence and imposed the basic sentence for a third degree felony, three years of imprisonment. NMSA 1978, § 31-18-15(A)(11) (2007, amended 2019). Defendant's conviction and sentence for third degree tampering were predicated on the jury's determination that the killing of Mr. Lackey was a second degree felony, but, as we have explained, that determination was made based on incomplete instructions that did not give the jury the alternative of determining that the killing was instead voluntary manslaughter. Had the jury been instructed on voluntary manslaughter and returned a guilty verdict on that charge, which is a third degree felony, § 30-2-3(A), and acquitted Defendant of first and second degree murder, the jury's verdict would have amounted to a determination that Defendant tampered with evidence of a third degree felony, *see generally State v. Alvarado*, 2012-NMCA-089, ¶ 14, ___ P.3d ___ (explaining that it is the province of the jury to determine the crime to which its tampering verdict relates and, in so doing, the degree of tampering that the defendant committed), *overruled on other grounds by State v. Radosevich*, 2018-NMSC-028, ¶ 2, 419 P.3d 176, and any conviction for tampering would have been a fourth degree felony, rather than a third degree felony. *Compare* § 30-22-5(B)(2), *with* § 30-22-5(B)(1). Accordingly, Defendant's third degree felony conviction for tampering with evidence cannot stand.

**{35}** The reversal of Defendant's tampering conviction raises the question of whether he may be retried on that charge consistent with principles of double jeopardy. The answer depends on whether the tampering conviction is based on sufficient evidence; if the evidence suffices, there is no bar to retrial. *State v. Mascarenas*, 2000-NMSC-017, ¶ 31, 129 N.M. 230, 4 P.3d 1221. The question we must answer is "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Cabezuela*, 2015-NMSC-016, ¶ 14, 350 P.3d 1145 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). Our review entails two steps. We first "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. Next we consider "whether the evidence, so viewed, supports the verdict beyond a reasonable doubt." *State v. Garcia*, 2016-NMSC-034, ¶ 24, 384 P.3d 1076. "The jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (alterations, internal quotation marks, and citation omitted).

**{36}** The jury instruction for tampering described the essential elements at issue as (1) "[D]efendant placed and/or hid a Pontiac G6[,]" and (2) Defendant "intended to prevent the apprehension, prosecution or conviction of himself[.]" Defendant contends that if we were to conclude that the evidence that Defendant left the scene of the shooting in the Pontiac suffices here, we would effectively be holding that "every crime involving a motor vehicle (or any other object) that is moved after a crime" involves tampering with evidence. But the State's evidence of tampering was not limited to

testimony that Defendant moved the Pontiac. Ms. Trimble testified that after Defendant drove the Pontiac away from the parking lot, he left it parked in an alley and contacted an unidentified person; that Defendant, the unidentified person, and Ms. Trimble went to a gas station and then returned to the alley where the Pontiac was parked; and that Defendant and the unidentified person walked toward the car and then returned running. A person who lived near the alley testified that, on the night of the shooting, she witnessed a car on fire in the alley and saw two people standing near the car and then running from it. Finally, a police officer testified that he responded to a call about a car fire that same evening and that the burned Pontiac was towed to the crime lab because of its link to the shooting of Mr. Lackey. Based on this evidence, the jury rationally could have inferred that Defendant parked the car in the alley and returned to set it aflame and that his intent in doing so was to prevent his apprehension, prosecution, or conviction for the killing of Mr. Lackey. *See State v. Duran*, 2006-NMSC-035, ¶ 7, 140 N.M. 94, 140 P.3d 515 (explaining that intent is often established by circumstantial evidence). Because the evidence of tampering sufficed, principles of double jeopardy do not bar retrial on that charge.

## B.      Conspiracy to Commit Tampering with Evidence

**{37}**    The instructional error also requires us to reverse Defendant's conviction for conspiracy to tamper with evidence. Defendant was convicted of conspiracy to tamper with evidence in violation of Section 30-28-2(B)(3), which makes conspiracy a fourth degree felony when the "the highest crime conspired to be committed is a third degree felony or a fourth degree felony." In concluding that Defendant tampered with evidence of second degree murder, the jury determined that the tampering at issue was third degree tampering with evidence. *See* § 30-22-5(B)(1). However, the need to reverse Defendant's murder conviction renders the degree of tampering "conspired to be committed" indeterminate. Section 30-28-2(B). "[W]here a jury cannot or does not find the level of the underlying offense," its determination that the defendant tampered with evidence can only support a conviction for misdemeanor tampering with evidence. *Radosevich*, 2018-NMSC-028, ¶¶ 27-29 (invalidating Section 30-22-5(B)(4) as unconstitutional to the extent that it imposes greater punishment than does Section 30-22-5(B)(3)). Therefore, because of the reversal of Defendant's murder conviction, the highest degree of tampering he could have conspired to commit was misdemeanor tampering. But conspiring to commit a misdemeanor is not a crime in New Mexico; our conspiracy statute prohibits only conspiracy to commit felonies. *See* § 30-28-2. We therefore must reverse Defendant's conspiracy conviction.

**{38}**    However, as with the tampering charge, principles of double jeopardy do not bar the State from retrying Defendant for conspiracy to commit tampering with a felony because the evidence of conspiracy suffices. The jury instruction for conspiracy described the elements at issue here as (1) "[D]efendant and another person by words or conduct agreed together to commit tampering with evidence[,]" and (2) "[D]efendant and the other person intended to commit tampering with evidence by destroying the Pontiac G6[.]" The evidence we summarized above in relation to the tampering charge amounts to substantial evidence of both elements. Based on that evidence, the jury

rationally could have concluded that Defendant and the unidentified person who accompanied him to the gas station and the alley where the Pontiac was parked agreed by words or conduct to set the car on fire with the intent to tamper with evidence. Retrial is permitted.

### III.    The District Court Erred by Admitting Officer Acata's Testimony that a Video Exhibit Depicted Defendant in Possession of a Firearm

**{39}**    Defendant also argues that this Court should reverse his murder conviction because the district court erred by allowing Officer Acata to testify to her interpretation of the surveillance footage and opine, based on that interpretation, about an important and disputed fact: whether Defendant was armed at the ATM. Because we have ordered a new trial on the murder charge, we need not determine whether the admission of the testimony at issue rises to the level of reversible or plain error and therefore warrants a new trial. However, we discuss whether the district court abused its discretion by admitting that testimony, *see State v. Garnenez*, 2015-NMCA-022, ¶ 29, 344 P.3d 1054, because the issue is likely to arise on remand. "An abuse of discretion occurs when [a] ruling is clearly against the logic and effect of the facts and circumstances of the case[,]" *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted), or when a ruling "indicate[s] a misapprehension of the law." *State v. Vargas*, 2016-NMCA-038, ¶ 10, 368 P.3d 1232.

**{40}**    The testimony Defendant challenges here was elicited when the State asked Officer Acata to describe what she saw as it played a black-and-white video captured by one of the two ATM cameras—a video that had been admitted into evidence as an exhibit. Officer Acata testified that the surveillance footage showed Defendant "draw a gun" while standing behind Victim at the ATM. Although she expressed her opinion as a matter of fact, Officer Acata came to it by inferring from her "training and experience" that "a dark object" in Defendant's hand could only have been "one thing." We agree with Defendant that the district court should not have allowed Officer Acata to testify to her own interpretation of the video evidence because the jury was just as capable as the officer of determining what the video depicted and the officer's testimony was therefore unhelpful to the jury.

**{41}**    Our rules of evidence restrict admissible opinion testimony—from lay witnesses and experts alike—to opinions that benefit the fact-finder's understanding or help the fact-finder determine a fact in issue. Rules 11-701(B), -702 NMRA. This restriction applies to a witness's identification of a person or item in a video recording. It may be helpful to a jury, and thus permissible, for a witness to identify a person appearing in a surveillance video if the court is satisfied that the witness is more likely than the jury to make an accurate identification. *See generally* 6 Clifford S. Fishman & Anne T. McKenna, *Jones on Evidence* § 40:12 (7th ed. 2020). This Court accepted this general rule in *State v. Sweat*, 2017-NMCA-069, 404 P.3d 20, adopting the reasoning of the Illinois Supreme Court in *People v. Thompson*, 2016 IL 118667, 49 N.E.3d 393, and holding that a lay witness may identify a person appearing in a video recording when "there is some basis for concluding that the witness is more likely to correctly identify

the [person] . . . than is the jury," where any one of five factors can demonstrate that the witness is more likely than the jury to make a correct identification. *Sweat*, 2017-NMCA-069, ¶¶ 21-24 (quoting *Thompson*, 2016 IL 118667, ¶ 41). Illinois's appellate courts have extended the general rule in *Thompson* to the identification of objects appearing in video evidence. *See People v. Gharrett*, 2016 IL App (4th) 140315, ¶ 76, 53 N.E.3d 332 ("[L]ay-opinion identification testimony is helpful when some basis exists to conclude that the witness is more likely to correctly identify the object from the surveillance recording than the jury."). We find *Gharrett*, like *Thompson*, persuasive and conclude that a witness may identify an object appearing in a video when the witness is more likely than the jury to correctly identify the object—i.e., when the witness has a special familiarity with the object. *See, e.g.*, *id.* ¶¶ 69, 78 (concluding that, because the witness had bundled "$303 cash on top of some checks" and thus had familiarity with the "particular size and shape" of that bundle, it was helpful to the jury for her to identify a bundle of cash that appeared vaguely in a video as the same bundle she had made); *United States v. Houston*, 813 F.3d 282, 287, 291-92 (6th Cir. 2016) (holding that the district court did not abuse its discretion in permitting a police officer to identify as a "Ruger Mini 14" a firearm that appeared in a video when there was foundation for the officer's special ability to identify the firearm in his testimony that his relative owned a Ruger Mini 14).

{42}     Applying these principles, we hold that Officer Acata's testimony was unhelpful to the fact-finder because there is no basis for concluding that Officer Acata was more likely than the jury to correctly determine whether the video shows Defendant holding a handgun. Because a handgun is an ordinary object, and Officer Acata had no special familiarity with the visual appearance of the handgun in question, she was no more likely than the jury to be able to accurately determine whether a handgun was visible in the video, which had been admitted into evidence. Officer Acata's *belief* that Defendant was armed has no bearing on what the video shows, and it was improper for her to testify that the video shows Defendant holding a gun; what the video does or does not depict was for the jurors to determine for themselves. *Cf. State v. Finan*, 881 A.2d 187, 193-94 (Conn. 2005) (stating that it had been improper to admit the testimony of several police officers purporting to identify the defendant in a surveillance video based on the officers' "suspicion" that a man appearing in the video was the defendant). "A witness, lay or expert, may not form conclusions for jurors that they are competent to reach on their own." *People v. McFee*, 2016 COA 97, ¶ 76, 412 P.3d 848. Here, the jury was competent to draw its own conclusion about whether the video depicts Defendant armed with a gun at the ATM, and Officer Acata was in no better position than the jury to draw those conclusions because she was not present on the night of the incident and therefore had no opportunity to observe whether Defendant was armed and because the record does not establish that she had knowledge of anything idiosyncratic about Defendant or his belongings. *See Mitchell v. State*, 641 S.E.2d 674, 677 (Ga. Ct. App. 2007) (explaining that it is "improper to allow a witness to testify as to the identity of a person in a video or photograph when such opinion evidence tends only to establish a fact which average jurors could decide thinking for themselves and drawing their own conclusions" (internal quotation marks and citation omitted)); *McFee*, 2016 COA 97, ¶¶ 75-76 (reasoning that the jury "was in precisely the same position" as a detective in its

ability to interpret the audio of a video recording where the detective did not witness the statements on the recording firsthand and had no special familiarity with the speaker's voice that made him more able to discern the recorded statements); *Gordon v. Commonwealth*, 916 S.W.2d 176, 179-80 (Ky. 1995) (holding that it was error to allow a witness to interpret a mostly inaudible audio recording rather than testify from personal recollection because it was "for the jury to determine as best it [could] what [was] revealed in the . . . recording without embellishment or interpretation by a witness"); *see also* 1 Kenneth S. Broun et al., *McCormick on Evidence* § 11 (8th ed. 2020) ("[B]efore admitting a lay witness's inference, the judge must not only be convinced that the witness possesses firsthand knowledge about the topic of the opinion; the judge must also conclude that it is impractical for the witness to verbalize the underlying facts to the extent that the lay jurors themselves would just as readily decide whether to draw the inference.").

**{43}** To the extent the State argues that Officer Acata's testimony was helpful to the jury because her "law enforcement experience" made her more able to detect a concealed firearm, we disagree. Officer Acata did not testify to any specific experience that makes her particularly adept at detecting concealed firearms, and we have no basis to conclude that general experience in law enforcement gives one that skill. We thus conclude that, under the circumstances here, it was not helpful to the jury for Officer Acata to provide her interpretation of the video and that the admission of her interpretation was therefore an abuse of discretion.

## IV.    The Timing of Defendant's Trial Did Not Violate the IAD

**{44}** Defendant argues that the district court erred by denying his motion to dismiss all of the charges with prejudice because his trial occurred outside of the 180-day time period generally prescribed by the IAD and because there was not good cause for a continuance. We hold that the district court acted within its discretion by granting the continuance and that the IAD therefore did not require the district court to grant Defendant's motion to dismiss.

**{45}** Under the IAD's speedy trial provisions, "if a prisoner demands disposition he must be brought to trial within 180 days of the delivery of the demand unless there is a continuance or tolling as determined by the court having jurisdiction of the matter. If he is not, his charges are to be dismissed with prejudice." *State v. Aaron,* 1984-NMCA-124, ¶ 8, 102 N.M. 187, 692 P.2d 1336; *see* NMSA 1978, § 31-5-12, art. 3(A) (1971) (requiring that trial be held within 180 days unless a continuance is granted); § 31-5-12, art. 5(C) (providing that the remedy for a speedy trial violation is dismissal with prejudice). The IAD permits "necessary or reasonable continuance[s]" if they are based on "good cause shown in open court" in the presence of "the prisoner or his counsel[.]" Section 31-5-12, art. 3(A).

**{46}** When reviewing a trial court's determination that good cause justified a continuance, we consider the totality of the circumstances. *State v. Livernois*, 1997-NMSC-019, ¶ 26, 123 N.M. 128, 934 P.2d 1057. Reversal is only warranted if the trial

court abused its discretion. *See State v. Hill*, 760 S.E.2d 802, 807 (S.C. 2014) ("[W]e will reverse a circuit court's decision to grant a continuance under the IAD only when it amounts to an abuse of discretion."); *accord Harper v. State*, 472 A.2d 473, 475 (Md. 1984); *Johnson v. Commonwealth*, 450 S.W.3d 696, 701 (Ky. 2014), *abrogated on other grounds by Roe v. Commonwealth*, 493 S.W.3d 814 (Ky. 2015).

**{47}** We assume for argument's sake,[2] as Defendant requests, that the 180-day period began on June 22, 2017, when the State filed an Agreement on Detainers, Form 7 in the metropolitan court. Under that assumption, the IAD deadline for trial was in December 2017, but the trial in the murder case did not occur until September 2018. The question before us then is whether the district court abused its discretion by concluding that there was good cause to conduct the trial approximately nine months after the 180-day period expired. We hold that it did not. Because of the complexity of the case and the volume of discovery, the district court acted within its discretion by setting the trial when it did.

**{48}** Under the IAD, the complexity of a case is an appropriate factor for courts to consider in setting a trial date. *See United States v. Whiting*, 28 F.3d 1296, 1307-08 (1st Cir. 1994) (recognizing that the complexity of a case is a valid consideration in determining whether to grant a continuance under the IAD); *Hill*, 760 S.E.2d at 807-08 (holding that the trial court did not abuse its discretion in concluding that there was good cause for a continuance under the IAD based in part on the complexity and magnitude of the case, which involved a double murder and a first degree burglary). And in Defendant's case, a local rule of the Second Judicial District Court, Rule LR2-308(G)(3) NMRA (2017), required the district court to consider "the complexity of the case" and "the number of witnesses" as well as "the time needed reasonably to address any eviden[tiary] issues[.]" The court did just that during a scheduling conference on September 28, 2017, finding that the case involved "voluminous discovery" and "numerous witnesses," including experts.[3] Based on these findings, the court set trial for September 24, 2018, and ordered, among other things, that the parties complete witness interviews by July 20, 2018. In a series of subsequent motions, the State asked the district court to enter orders concluding, under the IAD, that good cause justified holding trial beyond the 180-day mark and asked the court to extend pretrial deadlines. The State's reasons included the complexity of the case, consistent with the court's findings at the outset, plus two changes of defense counsel, one in February 2018 and the second in June 2018. The State contended (and Defendant did not dispute) that

2We make two additional assumptions in favor of Defendant: (1) that he properly activated the IAD's 180-day deadline; and (2) that his acquiescence, during the scheduling conference, to the district court setting his trial for September 2018 did not constitute a waiver of his speedy trial right under the IAD and did not toll the 180 days for any period of time.

3Defendant does not challenge these findings on appeal. The State points out that it identified over 100 witnesses, including an expert from the Office of the Medical Investigator. Defendant contends that prosecutors often identify far more witnesses than they actually intend to call, and that this results in an excessive number of pretrial interviews and unnecessary delay. To the extent that Defendant is inviting us to conclude that the prosecution listed an excessive number of witnesses in his case, his argument is unpreserved. *See* Rule 12-321(A) NMRA. Because Defendant does not argue that we should address the issue under any exception to the preservation requirement, we decline to do so.

each time Defendant changed counsel, the State was required to cancel pretrial interviews that had been scheduled and then reschedule those interviews with substitute counsel, which delayed the interviews and made it impossible to complete them by the July 2018 deadline the district court originally set. The court extended the pretrial motion deadlines and allowed the State until October 23, 2018, to bring the case to trial. The court held Defendant's trial in September 2018, and we see no basis for concluding that this violated the IAD. We hold that the district court acted within its discretion by concluding that the complexity of the case and the need to complete pretrial interviews of the State's witnesses amounted to good cause for a continuance and that the court therefore did not err by denying Defendant's motion to dismiss.[4]

**CONCLUSION**

**{49}** We reverse Defendant's convictions for second degree murder, tampering with evidence, and conspiracy to commit tampering with evidence, and we remand for a new trial. We affirm in all other respects.

**{50} IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge (concurring, writing separately)**

**SHAMMARA H. HENDERSON, Judge**

**HANISEE, Chief Judge (concurring, writing separately).**

**{51}** I write separately[5] to address the aptly named doctrine of "imperfect" self-defense. The defense is factually imperfect in that a defendant who *un*reasonably fears or acts in fear of death or great bodily harm may nonetheless receive a step-down instruction from murder to which he would not otherwise be entitled. It is legally imperfect, in my view, because the defense's generic factual applicability is not curtailed under New Mexico law to eliminate its usage when felony murder is at issue, or more to the point as demonstrated by the facts of this case, where an initial aggressor begins a

---

4In his brief in chief, Defendant argues that the district court erred in granting the continuance because its good cause determination was not based on evidence. It is not clear from Defendant's reply brief whether he has withdrawn this argument, but, in any event, it is contrary to our precedent. In *Aaron*, this Court explained that "there is no requirement for evidence in order to make a showing of good cause" and that "[i]n established practice such a showing is often made by statement of counsel." 1984-NMCA-124, ¶ 17. Although Defendant cites out-of-jurisdiction authority that requires evidence, Defendant has not asked us to overrule *Aaron*, and we therefore decline to reconsider its holding.

5To be clear, I assign no fault to today's Opinion which, following limited but established precedent, holds that entitlement to the defense of imperfect self-defense arises in New Mexico in all circumstances where a defendant "reacts *unreasonably* to fear caused by an appearance of danger of death or great bodily harm." Op. ¶ 25. Nor do I disagree that the facts of this case meet that threshold.

dangerous felony which culminates in the death of his chosen victim or of someone that acts to prevent the occurrence of the planned crime. It is the role of either our New Mexico Supreme Court or the New Mexico Legislature to repair imperfections in law, and I urge either or both to do so.

{52}    A brief examination of sensible limitations placed on the availability of general—that is to say, reasonable, or "perfect"—self-defense in New Mexico, and then of other jurisdictions' similar such restriction to the availability of imperfect self-defense, reveals an approach that makes vastly more sense, and is more consistent with our Legislature's differing treatment of murders paired with underlying felonies, than does the outcome in this case. First, our Supreme Court has held that a "claim of self-defense may fail if the defendant was the aggressor or instigator of the conflict." *State v. Lucero*, 1998-NMSC-044, ¶ 7, 126 N.M. 552, 972 P.2d 1143 (internal quotation marks and citation omitted). In *Lucero*, the defendant followed rival gang members to a vacant lot, discharged a gun into the air, and the rival gang members returned fire. *Id.* ¶¶ 8-9. The Court held that the defendant was the first aggressor, and as the instigator of conflict, was precluded from claiming self-defense as a justification or excuse for the shootings which occurred during the ensuing gun battle. *Id.* ¶ 9; *State v. Emmons*, 2007-NMCA-082, ¶¶ 12-13, 141 N.M. 875, 161 P.3d 920, (holding that a defendant who threatened repo men at gun point was not entitled to a self-defense instruction where the evidence reflected that the defendant was the initial aggressor and that there was no appearance of immediate danger or death before the defendant drew his gun).

{53}    New Mexico courts have also found that defendants who are initial aggressors, particularly those whose aggressive acts are carried out during the commission of a felony inherently or foreseeably dangerous to human life, are not entitled to self-defense instructions. In *State v. Chavez*, 1983-NMSC-037, ¶ 6, 99 N.M. 609, 661 P.2d 887, our Supreme Court held that a defendant first aggressor who entered a convenience store with a knife intending to rob the store, and subsequently stabbed and killed a patron who tried to stop the robbery, could not claim self-defense. The court noted that it is "well established in this jurisdiction that a defendant who provokes an encounter, as a result of which he finds it necessary to use deadly force to defend himself, is guilty of an unlawful homicide and cannot avail himself of the claim that he was acting in self-defense." *Id.* The court upheld the defendant's convictions for armed robbery and felony murder, noting that the defendant killed the victim during the commission of a felony "inherently or foreseeably dangerous to human life." *Id.* (internal quotation marks and citation omitted).

{54}    It is logical to conclude that a defendant who produces the conditions which make it seem necessary for them to kill or inflict serious bodily harm should be imputed the natural consequences of their own dangerous conduct. This is particularly true where the would-be victim responds to a defendant's aggressive behavior with a lawful use of force. This Court in *State v. Lara* held that a defendant was not entitled to a self-defense instruction where he pulled a knife on two store clerks after they chased the defendant to recover items that were stolen from the store. 1989-NMCA-098, ¶¶ 8-9, 109 N.M. 294, 784 P.2d 1037, *overruled on other grounds by State v. Tollardo*, 2012-

NMSC-008, 275 P.3d 110. In *Lara*, we stated that a juror "could infer that [the] defendant reasonably believed that [the clerks] were intending to seize him[,]" but that no reasonable juror could have viewed the clerks' actions as unlawful, and accordingly held that a self-defense instruction was not supported by the evidence. *Id.* ¶ 9.

**{55}** Here, similar to the dangerous circumstances initiated or crimes begun by the defendants in *Lucero*, *Emmons*, *Chavez*, and *Lara*, Defendant tried to rob Mr. Lackey at an ATM at night. He did so with immediate or nearby access to the gun he soon used to kill Mr. Lackey once Mr. Lackey turned out to be less helpless or compliant than Defendant foresaw. My view is that under these cases, Defendant was not entitled to the self-defense instruction he received and which the jury rejected. That is because in my view no reasonable juror could have concluded that Mr. Lackey's actions in defending himself were unlawful.

**{56}** Which necessarily brings up my second point, because the above-cited cases do not alone resolve Defendant's entitlement to a step-down instruction from the homicide with which he was charged, given that imperfect self-defense, rather than general self-defense, is at issue in this appeal. Imperfect self-defense is itself akin to a lesser included instruction insofar as an element of ordinary self-defense—that being the requirement that a defendant act reasonably in employing self-defense—is missing.[6] But in my view, prohibitions limiting the availability of general self-defense well illuminate why imperfect self-defense has no place in a case such as this, where felonious aggressors who ultimately, if not initially, take lives having first committed inherently dangerous felonies should not be provided a tool of law to escape full fault for the natural consequences of those acts.[7]

**{57}** I am not alone in this belief. Pennsylvania requires a claim of imperfect self-defense to satisfy all the requisites of justifiable self-defense (including that the defendant was not the aggressor and did not violate a duty to retreat safety), with the exception that imperfect self-defense involves an unreasonable, rather than a reasonable, belief that deadly force was required to save the actor's life. *See Com. v. Rivera*, 983 A.2d 1211, 1224-25 (Pa. 2009). The result is that a defendant is prohibited

---

6In contrast to perfect self-defense, which operates as a justification or excuse which entirely negates the criminal consequences of a killing, imperfect self-defense is neither a true defense nor an absolute one. *See generally Abeyta*, 1995-NMSC-051, ¶¶ 13-20 (explaining that a "claim of imperfect self-defense . . . presents an issue of mitigating circumstances that may reduce murder to manslaughter"); *see also People v. Rodarte*, 168 Cal. Rptr. 3d 12, 1168 (Ct. App. 2014) (describing imperfect self-defense as "a shorthand description of . . . voluntary manslaughter" and "a lesser offense included in the crime of murder" (internal quotation marks and citation omitted)).

7Indeed, this notion is manifest within the felony murder statute in New Mexico, NMSA 1978, § 30-2-1(A)(2), which holds perpetrators liable for deaths occurring "in the commission of or attempt to commit any felony" at the level of first-degree murder. *See Campos v. Bravo*, 2007-NMSC-021, ¶ 10, 141 N.M. 801, 161 P.3d 846 "([T]he doctrine's purpose is to further the legislative intent of holding certain second-degree murders to be more culpable when effected *during the commission of a felony*." (emphases added) (internal quotation marks and citation omitted)). While Defendant was here acquitted of felony murder, the propriety of jury instructions, such as that at issue in this appeal, are resolved before deliberations and verdicts.

from claiming imperfect self-defense if the defendant was the aggressor, or if the defendant violated a duty to retreat or avoid danger. *See Com. v. Tilley*, 595 A.2d 575, 582 (Pa. 1991) (holding that the defendant was not entitled to a voluntary manslaughter instruction because he forcibly entered the home of the victim with the intention of committing a burglary, and when he believed he would be discovered, sprang from a hiding place and shot the victim three times).

**{58}** California has held that imperfect self-defense may not "be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified[.]" *People v. Rangel*, 200 Cal. Rptr. 3d 265, 296 (2016) (internal quotation marks and citation omitted). This approach seems particularly instructive to the facts at hand in this case, given its application to circumstances where a victim successfully repels a felony crime and acts lawfully to prevent the defendant's escape or to otherwise seek police assistance or effectuate a citizen's arrest. *See State v. Arroyos*, 2005-NMCA-086, ¶ 5, 137 N.M. 769, 115 P.3d 232 ("Any person . . . may arrest another upon good-faith, reasonable grounds that a felony has or was being committed[.]").

**{59}** Another compelling approach is that taken by North Carolina, which has held that imperfect self-defense is available in felony murder cases only to the extent that self-defense relates to the applicable underlying felonies which give rise to the charge of felony murder. *See State v. Richardson*, 462 S.E.2d 492, 499 (N.C. 1995) ("[T]he purpose of the felony murder rule is to deter even accidental killings from occurring during the commission of a dangerous felony. To allow self-defense, perfect or imperfect, to apply to felony murder would defeat that purpose[.]"). In that case, where the underlying felonies were discharging a firearm into occupied property and assault with a deadly weapon, the court held that because only perfect self-defense was applicable to the underlying felonies, the defendant could not argue imperfect self-defense to avoid the felony murder charge. *Id.*

**{60}** I conclude by noting that our New Mexico Supreme Court has stated that "[i]mperfect self-defense occurs when an individual uses excessive force while otherwise *lawfully* engaging in self-defense." *State v. Henley*, 2010-NMSC-039, ¶ 20, 148 N.M. 359, 237 P.3d 103 (emphasis added). I urge that the Court accept certiorari in this case and to clarify that acting lawfully in the context of imperfect self-defense excludes circumstances where an initial aggressor commits an underlying felony. In my view, New Mexico Supreme Court Justices or lawmakers should determine whether imperfect self-defense may be employed to mitigate the criminal liability of defendants who kill citizens who exercise lawful force to repel violent and felonious criminal acts. My answer would be no.

**J. MILES HANISEE, Chief Judge**